UNITED STATES of America

v.

Jack TALLY, Defendant.

UNITED STATES of America

v.

John BIERWILER and Loren VanCuren, Defendants.

UNITED STATES of America

v.

Annette PETERSON, Defendant.

UNITED STATES of America

v.

Daniel L. EATON, Defendant.

Nos. 1:CR–93–0253, 4:CR–94–0045, 4:CR–94–0073 and 4:CR–94–0099–02.

United States District Court,
M.D. Pennsylvania.

Jan. 5, 1996.

Eric Pfisterer, Assistant United States Attorney, Harrisburg, PA, for U.S.

Bradley P. Lunsford, State College, PA, for defendant Jack Tally.

John A. Felix, Williamsport, PA, for defendant John Bierwiler.

Ronald C. Travis, Rieders, Travis, Mussine, Humphrey & Harris, Williamsport, PA, for defendant Loren VanCuren.

Philip M. Masorti, Bellefonte, PA, for defendant Annette Peterson.

Lee A. Ciccarelli, Williamsport, PA, for defendant Daniel L. Eaton.

### MEMORANDUM

McCLURE, District Judge.

### BACKGROUND:

Each of these cases is related to an organized marijuana trafficking conspiracy in and around the Corning, New York, area. When one of the central figures in that conspiracy, Gerald N. Eaton, was arrested and charged, he and other players in the operation devised a scheme to deflect blame for Eaton's role in the affair to Eaton's cousin, Christopher Peterson. Peterson, although a member of the conspiracy, was not the "kingpin" as portrayed during his trial, nor was he responsible for all of the relevant conduct on which his sentence was based. He was convicted and sentenced to thirty years in prison.

Following Peterson's trial, Eaton was sentenced. During his sentencing hearing, the government offered evidence associating Eaton with a particular field of marijuana found in North Central Pennsylvania. The association of Eaton with that field was the key to the entire investigation, since a number of fields in which marijuana was cultivated had been found. Tying Eaton to that particular field, with its distinctive characteristics, would link him to the larger marijuana operation.

In order to dissociate himself from that field, thereby reducing his criminal culpability, Eaton presented a number of alibi witnesses. The court rejected the evidence Eaton presented and found as a matter of fact

that Eaton was in the field. Subsequent to his sentencing, Eaton provided information to investigators that much of the testimony presented at the sentencing hearing, as well as at Christopher Peterson's trial, had been false.

Based on various levels of involvement in either the original conspiracy to distribute controlled substances, the conspiracy to lay the blame at the feet of Christopher Peterson, or the conspiracy to provide false evidence at Eaton's sentencing hearing, the defendants named in the above caption were indicted, and each entered a plea of guilty. All but Loren VanCuren agreed to cooperate with the government.

The computation of sentences began with the determination of a base offense level based on the quantity of marijuana which could be attributed to the individual defendant's conduct. Other defendants also were indicted, pled guilty, and were sentenced. In all, approximately twelve people were convicted of crimes relating to Gerald N. Eaton's various schemes.

Effective November 1, 1995, the United States Sentencing Commission amended the Sentencing Guidelines with respect to sentencing related to marijuana charges. In the past, when the number of marijuana plants exceeded 50, each plant was treated as the equivalent of 1 kilogram (1000 grams) of marijuana for sentencing purposes, while each plant was treated as the equivalent of 100 grams of marijuana if the number of plants was less than 50. U.S.S.G. § 2D1.1(c), notes following Drug Quantity Table. As amended, the Sentencing Guidelines provide that each plant of marijuana equates to 100 grams of marijuana regardless of the number of plants. U.S.S.G. § 2D1.1(c), note E following Drug Quantity Table. As applicable to the moving defendants, each plant now equates to 1⁄10 its previous value, which in turn would reduce the base offense level associated with that number of marijuana plants. The amendment may be applied retroactively.

Before the court are motions by the above-named defendants to modify sentence pursuant to 18 U.S.C. § 3582. Evidentiary hearings having been conducted with respect to each defendant's motion, the matter is ripe for disposition.

## DISCUSSION:

### I. FINDINGS OF FACT

#### A. General Findings

1. In May, 1989, a large clearing was discovered on State Game Lands in Potter County, one of the northernmost counties of Pennsylvania (the "Northern Tier"), which proved to have been planted with marijuana.

2. On August 8, 1989, authorities eradicated approximately 11,375 marijuana plants from this field.

3. During the summer of 1990, three fields of marijuana were discovered on State Game Lands in Tioga County, another Northern Tier County, containing a combined total of approximately 8,868 plants.

4. The manner in which the marijuana was cultivated in the Northern Tier fields included a number of distinctive features, such as: the use of fishing line to ensure straight rows of plants; roto-tilling; the clearing of trees in a circle and piling of the trees around the outside of the circle so that large animals could not get into the field; the placement of "chicken wire" fencing around the outside of the fields so that small animals could not get into the field; and leaving a tree standing in the middle of the field to restrict access to the field by helicopter.

5. In the summer of 1991, surveillance, including the use of motion detectors, was again conducted on a field of marijuana in Potter County which contained approximately 1,340 plants.

6. In this instance, the surveillance was successful, and two individuals were observed in the field on August 19, 1991.

7. One of the individuals, William Peterson, was arrested later when he attempted to get into his truck, which was parked in the vicinity of the field.

8. William Peterson admitted to having been in the field, and initially indicated that his cousin, Gerald N. Eaton, had been in the field with him.

9. After speaking to his uncle, Gerald L. Eaton, by telephone, William Peterson would not name Gerald N. Eaton as the person who had been in the field with him. (Gerald L. Eaton, another person indicted in this series of cases, is the father of Gerald N. Eaton. For the sake of simplicity, Gerald L. Eaton will be denominated hereinafter as Gerald Eaton, while Gerald N. Eaton will be denominated Gerry Eaton.)

10. Based on the identification of Gerry Eaton by a state trooper who saw Eaton in the field, Gerry Eaton was indicted and charged with cultivating the Potter County field.

11. In 1992, Jack Tally and Gerry Eaton agreed to lie about Christopher Peterson's involvement in the marijuana manufacturing and distribution scheme.

12. From late September through early November, 1992, Special Agent Keith P. Miller of the Drug Enforcement Agency interviewed a number of individuals from the Corning, New York, area at the Painted Post Police Department.

13. Also present during the interviews were Trooper Bernie Howard of the Pennsylvania State Police, Assistant United States Attorney Eric Pfisterer, and at times Chief of Police Donald W. Yost of Painted Post, New York.

14. These interviews included discussions with a number of witnesses who had provided alibi testimony on behalf of Gerry Eaton.

15. Both Loren VanCuren and John Bierwiler were interviewed, and were told by Agent Miller that the case was very serious and involved "tens of thousands of marijuana plants," although no more specific number was provided.

16. In January, 1993, during Christopher Peterson's trial, Jack Tally, Annette Peterson, David Cavallaro, and Gerry Eaton testified falsely that Christopher Peterson was the leader and organizer of the marijuana manufacturing and distribution ring when, in fact, Gerry Eaton was the leader and organizer.

17. During Gerry Eaton's sentencing hearing, the main issue was whether Gerry Eaton was the second person in the field with William Peterson on August 19, 1991.

18. If the government bore its burden of establishing that Gerry Eaton was in the field with William Peterson, Eaton could be held accountable for 21,613 marijuana plants.

19. During Gerry Eaton's sentencing hearing, Eaton called a number of witnesses to provide an alibi for Eaton with respect to the field.

20. Eaton also testified himself, and denied having been in the field of marijuana on August 19, 1991.

21. This court rejected the testimony of Eaton and his alibi witnesses and found as a matter of fact that Eaton was in the field with William Peterson on August 19, 1991.

22. Gerry Eaton was sentenced to a term of incarceration of 87 months.

23. Following his sentencing, Gerry Eaton indicated to investigators and counsel for the government that he had further information to provide, and later revealed a large group of people had conspired to obstruct justice and present false testimony before the court.

24. Based on this latest version of cooperation by Gerry Eaton, more individuals were indicted.

25. All of the persons who were indicted in the cases related to the marijuana conspiracy and later attempts to cover up for Gerry Eaton, save Christopher Peterson, entered pleas of guilty.

26. Each of the persons who entered guilty pleas in these related cases, save Loren VanCuren, provided substantial assistance to the government.

27. The persons convicted in these related cases and the terms of imprisonment imposed are/were:

| | |
|---|---|
| Christopher Peterson, No. 1:CV–92–0152–01 | 360 months |
| Gerry Eaton, No. 1:CR–91–0170–01 | 87 months |
| Daniel Clarkson, No. 4:CR–93–0288–01 | 78 months |

| | |
|---|---|
| Jack Tally, No. 1:CR–93–0253 | 64 months |
| David Cavallaro, No. 1:CR–92–0152–02 | 63 months |
| Daniel L. Eaton, No. 4:CR–94–0099–02 | 36 months |
| William Peterson, No. 1:CR–91–0170–02 | 30 months |
| Annette Peterson, No. 4:CR–94–0073 | 30 months |
| Gerald Eaton, No. 4:CR–94–0099–01 | 24 months |
| Sue Ellen Courtney, No. 4:CR–94–0074 | 12 months, plus 1 day |
| Pamela Elliott, No. 4:CR–94–0072 | 8 months |

28. In addition to the persons listed above, the government dismissed charges against James D. Eaton and Susan Clarkson.

29. When Gerry Eaton's activities with respect to the perjury and subornation of perjury at Christopher Peterson's trial were revealed, as well as Eaton's role in the marijuana conspiracy, the government moved for a downward departure, and the court reduced Christopher Peterson's sentence to 30 months.

### B. Daniel Eaton's Conduct

30. After fleeing the field on August 19, 1991, Gerry Eaton placed a telephone call to his brother, Daniel Eaton. Daniel Eaton then drove from Savona, New York, to Austin, Pennsylvania, to pick up Gerry Eaton, and drove him to Corning, New York.

31. In Corning, Daniel Eaton, Gerry Eaton, Gerald Eaton, and unindicted co-conspirators met to discuss measures that could be taken to obstruct the investigation into the marijuana growing enterprise.

32. In January, 1993, Daniel Eaton prepared a written statement claiming that it was not Gerry Eaton who had called him on August 19, 1991.

33. Daniel Eaton admitted his participation in obstructing the investigation and indicated that he was not paid for doing so.

34. In addition to his participation in the conspiracy to obstruct the investigation, Daniel Eaton participated in the growing and distribution of marijuana as set forth in more detail below.

35. In 1990, Daniel Eaton and his wife approached the owner of a cabin located along the Northern Tier and entered into a two-week rental agreement, for which they paid cash.

36. The cabin was used to process the marijuana grown by members of the group in the summer of 1990.

37. The Pennsylvania State Police eradicated 8,868 plants in the summer of 1990 which would have been processed at the cabin rented by Daniel Eaton; the number, of plants actually processed at the cabin has not been established.

38. When he was arrested by the New York State Police in 1991, Daniel Eaton was in possession of ten pounds of marijuana.

39. An informant indicated that Daniel Eaton's distribution of marijuana in 1991 was an ongoing occurrence, and that Daniel Eaton had possessed similar amounts over several months.

40. The 1,340 plants in the field in which William Peterson and Gerry Eaton were discovered also are attributable to Daniel Eaton through his participation in the distribution conspiracy and the conspiracy to obstruct the investigation.

41. Daniel Eaton profited financially from distributing marijuana and purchased real estate in the Corning area.

42. Daniel Eaton loaned Gerry Eaton $7,000.00 to finance a business, specifically a retail establishment called Third World.

43. The government characterizes the cooperation provided by Daniel Eaton as the key to finally revealing the activities of the group (at least the known activities), including those of his father, Gerald Eaton, and his brother, Gerry Eaton.

### C. Jack Tally's Conduct

44. In 1988, Jack Tally agreed with Gerry Eaton to grow marijuana on a large scale in Pennsylvania and New York.

45. In 1988, Tally and Gerry Eaton planted and maintained one large field in Potter County and a smaller field in New York state.

46. In 1989, Tally and Gerry Eaton planted and maintained two large and two small marijuana fields in Potter County.

47. Another large field in Potter County was planted and maintained by Tally, Gerry Eaton, and James Eaton.

48. On October 2, 1989, Pennsylvania State Police observed Tally near a marijuana field in Tioga County, Pennsylvania.

49. On seeing the troopers, Tally dropped approximately 50 marijuana plants and fled.

50. Tally was arrested on October 23, 1989, by the State Police and charged with respect to the marijuana field.

51. The government estimated that Tally was involved in growing approximately 6,000 plants in 1988 and 11,000 plants in 1989.

52. In 1992, Jack Tally and Gerry Eaton agreed to lie about Christopher Peterson's involvement in the marijuana manufacturing and distribution scheme.

53. In 1993, during Christopher Peterson's trial, Tally falsely testified that Christopher Peterson was the leader and organizer of the marijuana manufacturing and distribution ring when in fact Gerry Eaton was the leader and organizer.

54. After Christopher Peterson's arrest, in an attempt to ensure that Peterson would remain in custody pending trial, Tally painted a threatening message on the side of Annette Peterson's residence in order to leave the impression that Christopher Peterson had left the message.

55. Tally and Gerry Eaton determined that Tally would paint the message since Tally, like Christopher Peterson, was left-handed.

### D. John Bierwiler's Conduct

56. After fleeing from the marijuana field on August 19, 1991, Gerry Eaton began creating an alibi for himself by arranging for eight people to lie for him about his whereabouts on that night.

57. John Bierwiler agreed to lie on behalf of Gerry Eaton.

58. Bierwiler is involved in the sales of used cars.

59. Gerry Eaton approached Bierwiler and obtained a receipt purporting to show that Eaton had given Bierwiler a deposit to purchase a car on August 19, 1991.

60. Bierwiler received $5,000.00 from Gerry Eaton as payment for his assistance.

61. Bierwiler lied to investigators when questioned in the fall of 1991 about Gerry Eaton's whereabouts on August 19, 1991.

62. On March 2, 1993, Bierwiler testified falsely about the same subject matter at Gerry Eaton's sentencing hearing.

63. At the time that Bierwiler testified falsely on behalf of Gerry Eaton, Eaton potentially could have been held criminally culpable for 21,613 marijuana plants. Pre–Sentence Report for Gerry Eaton (Government Exhibit 2) at 4 ¶ 11.

### E. Loren VanCuren's Conduct

64. Loren VanCuren agreed to lie on behalf of Gerry Eaton concerning Eaton's whereabouts on August 19, 1991.

65. At the time that he agreed to lie on Eaton's behalf, VanCuren operated a body shop.

66. Shortly after being observed in the marijuana field, Gerry Eaton obtained from VanCuren a receipt purporting to show that Eaton had received an estimate for auto body work on August 19, 1991.

67. VanCuren received $5,000.00 from Gerry Eaton as payment for his assistance.

68. VanCuren lied to investigators when questioned in the fall of 1991 about Gerry Eaton's whereabouts on August 19, 1991.

69. On March 2, 1993, VanCuren testified falsely regarding the same matter at Gerry Eaton's sentencing hearing.

70. At the time that VanCuren testified falsely on behalf of Gerry Eaton, Eaton potentially could have been held criminally culpable for 21,613 marijuana plants. Pre–Sen-

tence Report for Gerry Eaton (Government Exhibit 2) at 4 ¶ 11.

71. At the time that VanCuren testified falsely on behalf of Gerry Eaton, VanCuren was aware that Eaton faced a mandatory minimum sentence of 10 years.

### F. Annette Peterson's Conduct

72. Annette Peterson was married to Christopher Peterson in 1991.

73. Annette Peterson lied to investigators in 1991, falsely stating that Christopher Peterson had told her that he was in the marijuana field with William Peterson on August 19, 1991.

74. Annette Peterson was romantically involved with Gerry Eaton while still married to Christopher Peterson.

75. Annette Peterson lied on behalf of Gerry Eaton in an attempt to minimize Eaton's role in the marijuana growing and distribution scheme.

76. During Christopher Peterson's trial, Annette Peterson falsely testified concerning a number of matters, including but not limited to:

(a) Christopher Peterson telling her that he had been in the field with William Peterson;

(b) Annette Peterson's romantic involvement with Gerry Eaton, including Eaton being the father of one of her children;

(c) Christopher Peterson having painted a threatening statement on the side of Annette Peterson's residence, when Annette Peterson knew that the message had not been painted by Christopher Peterson.

77. Annette Peterson testified falsely at Gerry Eaton's sentencing hearing with respect to Gerry Eaton's whereabouts on August 19, 1991, and Christopher Peterson's purported statement that he had been in the field.

### II. REVIEW OF THE CASE

In order to properly exercise our discretion with respect to the motions to modify sentences, it is important to place the sentences imposed into context. From its inception, this case was unique, to say the least:

trial evidence including strippers and a "swing girl" from Texas, testifying as to the spending and tipping habits of Christopher Peterson, Gerry Eaton, David Cavallaro, and others who travelled to Texas to make purchases of Mexican marijuana and cocaine; a colorful defense attorney from Philadelphia and a small-town police chief in snake-skin boots known by the moniker "Yost of the Post"; lurid tales of infidelity, spousal abuse, biker gangs, and murder; and most of a single family involved in the marijuana trade.

The case also is unique in that, like the proverbial bad penny, it keeps turning up. The Pennsylvania State Police first learned of the marijuana fields in 1989, and began their investigation at that time. William Peterson and Gerry Eaton were discovered in a field in 1991, at which time the prosecution of the case can be said to have begun. Christopher Peterson stood trial and was convicted in January, 1993, and was sentenced on April 14, 1993, to a term of incarceration of 360 months. More sentencings took place thereafter, as did more indictments. There have been appeals, collateral motions, and correspondence from defendants in various cases as well as from their families. Now, nearly three years after Christopher Peterson was convicted, defendants dissatisfied with their sentences again approach the court seeking a reduction in their terms of incarceration.

It also is important to review the conduct of the various defendants and to place that conduct into the context of the sentences that could have been imposed and which actually were imposed.

The saga began in the late 1980's when Gerry Eaton combined with various other individuals to grow marijuana on State Game Lands in Pennsylvania's Northern Tier. At various times, members of the group travelled to Texas to purchase quantities of marijuana grown in Mexico. They occasionally would purchase cocaine as well. A large portion of the profits of the enterprise were re-invested, and the group soon had a rototiller, 4-wheel drive off-road vehicles, and other machinery to assist in the cultivation. Members also purchased real estate and interest in Third World, a store in a mall in the

Corning area. Gerry Eaton financed the building of a new home, ostensibly for his parents, and avoided reporting requirements for financial transactions by limiting each contractor to an amount under $10,000.00. The group also entered into other activities, and Daniel Eaton was able to show investigators where plates for counterfeit stamps were buried.

At Christopher Peterson's trial, a hunter testified that he had come upon one of the marijuana fields while spotting turkeys. He reported the find to the State Police, and surveillance began. Eventually, a number of fields were discovered with tens of thousands of plants. Gerry Eaton eventually related to investigators that the amount may have been between 80,000 and 100,000 plants.

Once Gerry Eaton and William Peterson were caught, a new conspiracy developed. The object of this conspiracy was to avoid the punishment of Gerry Eaton for his leadership role in the marijuana cultivation conspiracy. In league with his father, Gerald Eaton, and others, Gerry Eaton decided to place the blame on his cousin, Christopher Peterson. He enlisted the aid of Jack Tally and Annette Peterson, who provided elaborately constructed, false testimony which implicated Christopher Peterson as the "kingpin" of the organization. Christopher Peterson was convicted, had 40,000 plants attributed to him, and was given a 4–point adjustment for his role in the offense. *See* Pre–Sentence Report for Christopher Peterson at 5–6 ¶¶ 15, 17. Based on a Total Offense Level of 42 and a Criminal History Category of I, Christopher Peterson was sentenced to a period of incarceration of 360 months. *Id.* at 6 ¶ 21, 7 ¶ 25.

The time then came for the sentencing of Gerry Eaton. Again, an elaborate scheme was developed to deflect the blame from Gerry Eaton, and involved Gerald Eaton and Daniel Eaton. Other people from the Corning area also were recruited to provide false testimony on behalf of Gerry Eaton. For example, a waitress from a local restaurant testified that Gerry Eaton had eaten there on the night that he was suspected of having been in the field. She provided a fake receipt to support her testimony. In short, the Eaton family assembled a team of liars to disrupt the investigation and prosecution of Gerry Eaton's crimes. Of course, members of the Eaton family were star players on the team of liars, and Gerry Eaton himself was to be the superstar.

Unfortunately, Gerry Eaton did not live up to his role. It has never been more obvious to this court that someone was lying as when Gerry Eaton took the stand. We therefore found that, in direct contradiction of the testimony of Gerry Eaton and his army of fabricators, Gerry Eaton was in the marijuana field with William Peterson on August 19, 1991.

Gerry Eaton's sentence included a term of incarceration of 87 months. Following the imposition of sentence, Gerry Eaton contacted the prosecutor and indicated that he had further information to provide. Gerry Eaton then revealed further information concerning his activities relating to both the cultivation of marijuana and the conspiracy to cover up those activities. He implicated his father and two brothers, along with Annette Peterson. Daniel Eaton cooperated with authorities, and the full extent of the activities of the Eatons began to emerge.

Gerald Eaton, a former Treasury Department investigator himself, had worked with his sons to help Gerry Eaton avoid punishment. At Gerald Eaton's direction, William Peterson had been convinced to say no more about the events in the marijuana field. The purchases of businesses and realty, the burial of other drug trafficking proceeds, and the stamp scheme all came to light. Gerry Eaton had attributed his wealth to a tee-shirt business, and his free spending had attracted friends who later helped to hide his activities. VanCuren and Bierwiler, for example, were each paid $5,000.00 for lying on Gerry Eaton's behalf. With their conduct exposed, the ringleader himself cooperating with the government, and a more credible witness in the person of Daniel Eaton ready to testify, the remaining defendants began to enter guilty pleas and to provide assistance (with the exception of VanCuren, who pled guilty but provided no substantial assistance).

### III. IMPOSITION OF THE SENTENCES

Having been presented with all of the information reviewed above, the court was left to consider the sentences to be imposed on each defendant. At the time the court began these considerations, Gerry Eaton had been sentenced to a period of incarceration of 87 months. The government was barred from taking any further action against Gerry Eaton due to agreements into which he had entered in each phase of his cooperation. Although his perjury at Christopher Peterson's trial and his own sentencing hearing had breached his initial plea agreement, a subsequent agreement barred prosecution for the offense based on his continued cooperation. The government's constraint with respect to Gerry Eaton's sentence therefore also constrained the court.

As a result of Gerry Eaton's sentence, this case became different from the usual criminal case. The leader and organizer of the various conspiracies was sentenced to a term of imprisonment of 87 months, a sentence which could not be changed to impose a longer term of incarceration. It would be unjust to impose longer sentences on lesser players in the affair. The court therefore found itself in a position of considering the relative culpability and cooperation of each defendant, with Gerry Eaton's sentence as a starting point, and sentenced accordingly. In essence, when the government made its motions for downward departures for each defendant, in addition to the extent of the individual defendant's assistance, the amount of the departure depended on what that defendant had done compared to Gerry Eaton and any other defendant previously sentenced.

In considering the manner in which this procedure affected the sentences imposed, it is necessary to begin with Gerry Eaton himself. As noted, Gerry Eaton was the leader and organizer of the conspiracy for which Christopher Peterson was convicted and sentenced. Gerry Eaton's base offense level, then, should have been 38 under the Sentencing Guidelines in effect in 1993, based on the 40,000 plants and processed marijuana. *See* Pre–Sentence Report for Christopher Peterson at 5–6 ¶ 15. There would be a 4–point upward adjustment for Gerry Eaton's role as leader and organizer. *Id.* at 6 ¶ 17. Unlike Christopher Peterson, *id.* at 6 ¶ 19, Gerry Eaton would also get two added points for obstruction of justice. United States Sentencing Guidelines (hereafter cited as U.S.S.G.) § 3C1.1. Gerry Eaton's evasion from custody, obstruction of the investigation, perjury and subornation of perjury would negate any downward adjustment for acceptance of responsibility. U.S.S.G. § 3E1.1 and Application Note 1(a), (d). Gerry Eaton therefore should have had a Total Offense Level under the Guidelines of 44 (reduced to 43 as the maximum possible Total Offense Level under the Guidelines, U.S.S.G. Ch. 5, Pt. A, Application Note 2), and should have been subject to life imprisonment regardless of his Criminal History Category. U.S.S.G. Ch. 5, Pt. A (Sentencing Table). Because of the plea agreements, however, Gerry Eaton avoided a life sentence and will serve a maximum sentence of only 87 months (or 7¼ years).

Under the Sentencing Guidelines as amended in 1995, based on the 40,000 plants and processed marijuana, Gerry Eaton's Base Offense Level would be reduced from 38 to 34. U.S.S.G. § 2D1.1(c)(3). Again, there would be a 4–level upward adjustment for his role as a leader and organizer, U.S.S.G. § 3B1.1(a), and a 2–level upward adjustment for obstruction of justice. U.S.S.G. § 3C1.1. No downward adjustment for acceptance of responsibility would be appropriate. U.S.S.G. § 3E1.1 and Application Note 1(a), (d). With a Total Offense Level of 40 and a Criminal History Category of I, Pre–Sentence Report for Gerry Eaton at 5 ¶ 24, the sentencing range for the offense (calculated on the violation of 21 U.S.C. § 841(b)(1)(vii)) would be 292–365 months, or between 24 years, 4 months and 30 years, 5 months. Using the minimum of the range, and prior to any motion by the government for a downward departure, Gerry Eaton has saved himself 205 months (or 17 years, 1 month) of incarceration.

It is clear from the foregoing, then, that Gerry Eaton was able to manipulate events to his advantage, and succeeded in largely

avoiding the punishment that was due. The government was prevented from remedying the injustice once it discovered Gerry Eaton's true role because it had entered into the second plea agreement with Gerry Eaton under which it could not prosecute him based on information gathered in his further cooperation (more accurately termed his initial cooperation, since the earlier cooperation was anything but that). Thus, his clear breach of the earlier plea agreement could not be used as the basis for bringing additional charges. Without additional charges, of course, the court could not impose any further period of incarceration on Gerry Eaton, and the sentence could not be changed as appropriate.[1]

The first and most important circumstance facing the court, then, at the time of sentencing, was that the primary player had received far less than his due. We therefore looked at each defendant's role in the offenses and the level of cooperation each provided, and compared that person to Gerry Eaton.

As an example, David Cavallaro was a major player in the conspiracy to distribute narcotics and the conspiracy against Christopher Peterson, but did not play a role in trying to help Gerry Eaton avoid a proper sentence. In fact, he testified at Gerry Eaton's sentencing hearing against Eaton. Cavallaro was sentenced to 63 months of incarceration, which was less than Eaton but more than those with lesser roles in the marijuana distribution and/or obstruction of justice schemes.

In an order dated November 30, 1995, we outlined the issues before the court for purposes of the hearings on the motions to modify the sentences of the defendants named in the caption. We repeat part of that discussion to set forth the context of the exercise of our discretion.

## IV. DISCRETION OF THE COURT

■ The parties all agree as to the controlling statutory and Guidelines provisions. Most importantly, 18 U.S.C. § 3582(c)(2) pro-vides the court with discretion to modify a term of imprisonment previously imposed based on a sentencing range that has subsequently been lowered by the Sentencing Commission. In exercising this discretion, a reduction must be consistent with applicable policy statements issued by the Commission, and the court must consider the factors set forth in 18 U.S.C. § 3553(a).

■ It appears, then, that consideration of the instant motions involves a two-step process: (1) determining whether modification of sentence is appropriate upon consideration of the factors set forth in § 3553(a); and (2) if so, to what term of incarceration should the sentences be modified. The factors set forth in § 3553(a) are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant;

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, and that are in effect on the date the defendant is sentenced; or

(B) in the case of a violation of probation or supervised release, the applicable

---

1. Fortunately, the same cannot be said for Christopher Peterson, as the government moved for a re-sentencing based on the information finally available as to his true role in the conspiracy. Peterson's sentence was reduced to 30 months from the 360 months to which he originally had been sentenced.

guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code;

(5) any pertinent policy statement issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)(2) that is in effect on the date the defendant is sentenced;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C.A. § 3553(a) (West 1985 & Supp. 1995).

Based on these factors, and particularly those numbered (1) through (3), it is appropriate for the court to consider all of the circumstances surrounding a defendant's conduct in exercising its discretion under § 3582.

### V. DANIEL EATON

■ Daniel Eaton was sentenced on September 26, 1994, to a term of imprisonment of 36 months. The first question before the court is whether it should exercise its discretion to reduce this sentence based on the amendment to the Sentencing Guidelines.

■ Daniel Eaton indicates in his motion that, if the motion is granted, he intends to withdraw his appeal of the denial of a motion under 28 U.S.C. § 2255. Daniel Eaton's Motion to Modify Imposed Term of Imprisonment (record document no. 106) at 1 ¶ 8. The court denied the § 2255 motion because it believed that denial was the correct action to take. The court does not grant later motions in order to insulate earlier decisions from review by the Court of Appeals, and would not consider for purposes of the instant motion the fact that Daniel Eaton has an appeal pending. In any event, Eaton's offer has been mooted by the Third Circuit's affirmance of this court's actions in its order entered December 29, 1995.

Daniel Eaton entered a plea of guilty to Count IV of the indictment, conspiracy to obstruct justice. In the pre-sentence report, his Base Offense Level under the Sentencing Guidelines was set forth as 26. This number was reached by looking at the Base Offense Level of the underlying offense of conspiracy to distribute marijuana, using a total of 1,340 plants, and subtracting 6 levels. Pre–Sentence Report for Daniel Eaton at 6 ¶ 16.

The fact of the matter, though, is that the obstruction related to Gerry Eaton's offense, which involved the 40,000 plants and 1,600 pounds of marijuana noted in Christopher Peterson's pre-sentence report, as well as the additional plants not set forth. In addition, Daniel Eaton participated in the cultivation, treatment and distribution of the marijuana grown in the Northern Tier fields. Daniel Eaton also loaned money to Gerry Eaton for the business known as Third World, supporting a charge of money laundering. None of this additional conduct was taken into consideration at the time Daniel Eaton was sentenced.

At the time of Daniel Eaton's sentencing, the court granted the government's motion for a downward departure for substantial assistance under U.S.S.G. § 5K1.1 and departed 5 levels. The amount of this departure was determined as discussed above, by comparing the conduct of which the court was aware and the assistance provided, relative to that of Gerry Eaton. The reason for the latter is that it simply would be unfair to sentence defendants in one case to a longer term of incarceration than a person with a higher level of culpability.

Based on the actual conduct of Gerry Eaton and Daniel Eaton, the Base Offense Level for Daniel Eaton at the time of sentencing should have been 32, rather than 26, representing Gerry Eaton's proper Base Offense Level minus 6 levels. From this would be subtracted 3 levels for timely acceptance of responsibility. Pre–Sentence Report for Daniel Eaton at 7 ¶ 21. With a Criminal History Category of III, Pre–Sentence Report for Daniel Eaton at 8 ¶ 32, and a Total Offense Level (prior to a motion under § 5K1.1) of 29, Daniel Eaton's sentencing range would have been 151 to 188 months. Even with the 5–level reduction, Daniel Eaton's sentencing range would have been 63 to

78 months.[2] Based on Gerry Eaton's manipulation, then, Daniel Eaton's sentencing range was reduced by at least 27 months (63 minus 36).

As stated previously, under the Sentencing Guidelines as amended in 1995, and based on the 40,000 plants and processed marijuana, Gerry Eaton's Base Offense Level would be 34. Again subtracting 14 levels (6 for the Base Offense Level, 3 for timely acceptance of responsibility, and 5 by departure for substantial assistance), Daniel Eaton's sentencing range is 41 to 51 months, also above the sentence of 36 months actually imposed.

At the hearing on the instant motion, both defense counsel and .counsel for the government referred to the level of cooperation by Daniel Eaton. We note, however, that a 5–level reduction based on the government's § 5K1.1 motion took this into account, and was an exceptional reduction. It also should be noted that the large departure was warranted so that Daniel Eaton's sentence would be consistent with that of Gerry Eaton and so does not reflect the departure warranted for the substantial assistance standing alone, i.e. absent the need to determine the sentence in relation to that of Gerry Eaton.

We also recognize that Daniel Eaton has exhibited good conduct while incarcerated. However, weighing the totality of the circumstances, we simply do not see this factor as outweighing the fact that Daniel Eaton received a significantly lower sentence, even under the amended Guidelines, than would have been imposed but for the contumacious behavior of Gerry Eaton. Having already received such a large benefit, we see no reason to add a further benefit as sought by Daniel Eaton.

Daniel Eaton's motion for a reduction of sentence will be denied.

2. The statutory maximum for the charge to which Daniel Eaton pled guilty is 5 years or 60 months. 18 U.S.C. § 371. The statutory maximum would control over the Guidelines Range. U.S.S.G. § 5G1.1(a). Thus, in each instance in which Daniel Eaton's sentencing range is more than 60 months, the sentence actually imposed would be reduced to 60 months. The range still must be computed, and the higher amounts are

## VI. JACK TALLY

■ Perhaps the most significant reduction of a sentence among all of the defendants save Gerry Eaton in these cases was that of Jack Tally. Tally received a sentence of 63 months, which included a 9–level downward departure based on the government's motion under U.S.S.G. § 5K1.1. This departure reduced Tally's sentencing range from 168 to 210 months, to 63 to 78 months. Tally's sentence reflected a reduction of 105 months, or nearly nine years.

With the amendment to the Sentencing Guidelines, which would reduce the Base Offense Level by four levels, Tally's guideline range prior to the § 5K1.1 motion would be 108 to 135 months. His sentence of 63 months is 45 months below the new minimum of 108 months. He thus effectively received a reduction of at least 45 months, to a range 5 levels below that which would have been applicable under the amended guidelines before the downward departure. With a lower range from which to depart, and considering that part of the 9–level reduction was due to the conduct of Gerry Eaton and the imposition of a commensurate sentence, the 5–level reduction is more than ample to represent the substantial assistance provided by Jack Tally.

Jack Tally's motion to modify sentence will be denied.

## VII. JOHN BIERWILER

■ John Bierwiler was given a 6–level decrease from his Base Offense Level as a result of the government's motion under U.S.S.G. § 5K1.1. Using the calculations for what should have been Gerry Eaton's Base Offense Level, *see* Section III above, which again drive this defendant's calculations, Bierwiler's Total Offense Level would be 20 (Base Offense Level of 34 minus 6 or 28; 2–level decrease for acceptance of responsibili-

set forth herein to demonstrate how much of a reduction Daniel Eaton received in that context. It should be noted, however, that the offense conduct to which Daniel Eaton admitted included the cultivation of marijuana, which would have a higher statutory maximum term of incarceration. *See* 18 U.S.C. § 841 (charged in Count II of the indictment).

ty; and 6–level downward departure for § 5K1.1 motion). With a Criminal History Category of I and a Total Offense Level of 20 under the Guidelines as amended, Bierwiler's sentencing range should have been 33 to 41 months. Bierwiler's sentence of 24 months is well below this range, again due to the conduct of Gerry Eaton.

Bierwiler's motion for modification of sentence will be denied.

### VIII.  LOREN VANCUREN

■ Unlike the other defendants, Loren VanCuren was not the beneficiary of a government motion under U.S.S.G. § 5K1.1. Using the calculation for what should have been Gerry Eaton's Base Offense Level, *see* Section III above, VanCuren's Total Offense Level would be 26 (Base Offense Level of 34 minus 6 or 28; 2–level decrease for acceptance of responsibility). With a Total Offense Level of 26 and a Criminal History Category of I, VanCuren's sentencing range under the amended Guidelines would have been 63–78 months, with a statutory maximum of 5 years. *See* 18 U.S.C. § 1623(a). The statutory maximum therefore becomes the Guideline sentence. U.S.S.G. § 5G1.1(a).

VanCuren was sentenced to 51 months' incarceration. Even under the Guidelines as amended, VanCuren benefitted greatly from Gerry Eaton's conduct. His motion for modification of sentence will be denied.

### IX.  ANNETTE PETERSON

■ Annette Peterson's sentencing range under the Guidelines also is driven by the criminal conduct of Gerry Eaton. Using the calculations for Gerry Eaton's Base Offense Level, *see* Section III above, Annette Peterson's Total Offense Level is 21 (Base Offense Level of 34 minus 6 or 28; 3–level decrease for timely acceptance of responsibility; 4–level downward departure pursuant to government's motion under U.S.S.G. § 5K1.1). With a Total Offense Level of 21 and a Criminal History Category of I, Annette Peterson's sentencing range would have been 37 to 46 months. She was sentenced to a period of incarceration of 30 months, again below the range that would have applied but for the conduct of Gerry Eaton.

Annette Peterson's motion to modify sentence will be denied.

### X.  OTHER FACTORS CONSIDERED

■ The defendants have argued, either in briefs in support of their motions to modify sentence or orally at the time of their hearings, that the court should not consider evidence of plants other than those discussed in each defendant's pre-sentence report. The basic premise seems to be that the government is estopped from contending that more plants were involved because there was no objection to the pre-sentence reports in this respect.

This argument might have validity if we determined that the sentences would be modified. However, it appears to be entirely appropriate to this court to consider all of the defendants' conduct in determining whether any sentence should be modified. Stated another way, if a defendant contends, "My sentence of X months *should* be Y months because of the amendments to the Guidelines," the court has the discretion to consider the fact that the original sentence *should* have been X + 10 months, and the amendments do not reduce the sentence that *should* have been imposed below the level of X months.

This manner of exercising our discretion is consistent with two important policies underlying the Sentencing Guidelines. First, the Sentencing Guidelines promote sentencing based on actual, as opposed to charged, conduct. U.S.S.G. Ch. 1, Pt. A, Subpt. 4(a). In this instance, we review what Gerry Eaton actually did, and therefore what it was that these defendants assisted in doing or in covering up. Had Gerry Eaton been sentenced properly, these defendants would have been exposed to far greater penalties than those which were imposed.

Second, the Sentencing Guidelines seek to achieve uniformity of sentencing for similar offenses committed by similar offenders. U.S.S.G. Ch. 1, Pt. A, Subpt. 3. In this instance, the sentences imposed were lower than would be imposed under normal circumstances, i.e. absent the influence of Gerry Eaton's conduct. By denying the motions to

modify sentence, the court brings the sentences imposed more into line with similar offenses committed by similar offenders, again using the actual conduct of the offenders.

■ The moving defendants also argue that the Sentencing Commission indicates a policy that sentences imposed prior to the amendments should be reduced because they did not reflect the actual seriousness of the offense. This reasoning is based on the attempt to introduce more fairness and consistency into sentencing for offenses involving marijuana. *See* Amendment 516 to Sentencing Guidelines (1995). The problem with this reasoning, again, is that the sentences imposed already were reduced before the amendments and without application of the amendments, due to the fact that Gerry Eaton's sentence was reduced and his reduced sentence controlled the sentences imposed on the moving defendants.

■ The defendants also point to their conduct since being incarcerated. In general, the moving defendants have been demonstrating good adjustment to incarceration. Particularly troubling are the cases of Annette Peterson and Jack Tally, who appear to be exemplary inmates and who were very impressive in stating their reasons supporting sentence modification to the court. The gist of this argument by the defendants is that society has no interest in keeping them in prison because they have learned their lesson and straightened out their lives.

Certainly, these defendants are to be commended for their adjustment while incarcerated.[3] The fact is, however, that society's interest in incarcerating those convicted of criminal offenses is broader than the matters discussed by defendants (such as job history, education, etc.). Incarceration also serves the purpose of punishment, and serves as a deterrent both to the inmate and others who may be tempted to engage in similar conduct. Other mechanisms exist, such as statutory reductions in time to be served, which benefit the inmate who adjusts well to being imprisoned. We do not see the adjustment of these defendants as outweighing the broader societal interests discussed, or the policies expressed in the Guidelines themselves.

■ Particularly troubling to the court at any time is the effect of incarceration on members of a defendant's family. These defendants point out the effect of their incarceration, and in some instances provide documentary support. The easy answer, of course, is that the defendants knew that committing a crime leads to punishment, and they knew that they had families. If they did not want their punishment to affect their families, they should not have committed crimes.

There is much more in response to this argument than the answer which comes so quickly to mind. The fact is that every day law enforcement officers work to stop conduct like that involved in this case. This work often involves great risk to themselves, particularly when drug trafficking is involved. In this instance, the Pennsylvania State Police conducted surveillance in marijuana fields in a remote part of the Commonwealth. This surveillance involved a tremendous amount of resources, including manpower and equipment. Even when officers are not directly threatened, there is always the risk of danger in such a situation. The law enforcement officers who do this kind of work also have families. Because of the risks involved, their family members do not know whether the officer will return safely from a day at work.

The trafficking in drugs affects society at large, as well. The cost of law enforcement is borne by taxpayers. Industry pays for lost productivity on the part of drug users, and the families of drug users are directly affected by this behavior. The impact of drugs on the general deterioration of American culture need not be retold here.

■ We recognize that a number of the moving defendants were not directly involved in marijuana distribution. They were involved, however, in attempting to screen this

---

3. In addition to all the evidence received at the various hearings, the court has, by separate order, directed the docketing of various supplemental submissions by the defendants. These have all been taken into consideration by the court in reaching its decision on these motions.

activity from the law. Such conduct allows marijuana traffickers to continue this insidious business, and is just as reprehensible.

This discussion is not intended to preach to the moving defendants, but is intended to reflect the seriousness of their conduct. It cannot be emphasized enough that these matters are not to be engaged in lightly, and it often has appeared to this court, in the various proceedings related to these cases, that the defendants often do not grasp the gravity with which this court views their conduct. There were illegal drugs cultivated and distributed, lies to investigators, lies to the prosecutor, and lies to this court. Wide-scale conspiracies such as this allow criminals to escape justice, contribute to disrespect for the legal system, and tend to create the practical equivalent of a lawless society. Each of these eventualities is intolerable in a society governed by the rule of law.

### XI. CONCLUSION

The court having considered the 1995 amendments to the Sentencing Guidelines, the policy statements of the Sentencing Commission, and the factors set forth in 18 U.S.C. § 3553(a), each of the motions to amend sentence will be denied.