**UNITED STATES of America**

v.

**Janet BIFIELD, Daniel Bifield, Beverly Davis, William McDermott, Thomas Harrison, Robert Sizemore, and Stephen Montgomery, Defendants.**

**United States of America**

v.

**Diane Oberley, Defendant.**

**United States of America**

v.

**Erica Rowlands, Defendant.**

**Nos. 4:CR–97–0195, 4:CR–96–0312, 4:CR–97–0011.**

United States District Court, M.D. Pennsylvania.

March 25, 1999.

George J. Rocktashel, Assistant United States Attorney, U.S. Attorney's Office, Williamsport, PA, for United States of America.

Michael E. Groulx, Williamsport, PA, for defendant Janet Bifield.

Merrill Rubin, New York, NY, for defendant Daniel Bifield.

Stephen F. Becker, Lewisburg, PA, for defendant Beverley Davis.

Thomas A. Walrath, Wellsboro, PA, for defendant William McDermott.

Mark D. Lancaster, Karsh & Lancaster, Pittsburgh, PA, for defendant Thomas Harrison.

Thomas A. Thornton, Assistant Federal Public Defender, Harrisburg, PA, for defendant Robert Sizemore.

Eric R. Linhardt, Williamsport, PA, for defendant Stephen Montgomery.

Kenneth R. Gallen, Gollatz Griffin & Ewing, West Chester, PA, for defendant Diane Oberley.

John A. Felix, Williamsport, PA, for defendant Erica Rowlands.

## MEMORANDUM

McCLURE, District Judge.

## BACKGROUND:

This case presents a unique instance of inmates at a high-security institution using sophisticated means to commit sophisticated, white-collar crimes, assisted by the above-named defendants. Moreover, it involves criminal activity over an extended period, employing the services of persons outside the prison system to facilitate and to prevent detection of the crime, and to continue the operation. It is a prime example of what can be accomplished despite the imposition of restrictive conditions of confinement.

Before the court is the question of sentencing ranges of the various defendants, based in part on each defendant's role in the charged offense.

## DISCUSSION:

### I. STATEMENT OF FACTS

#### A. Procedural History

On August 27, 1997, a grand jury sitting in the Middle District of Pennsylvania returned an indictment charging defendants Janet Bifield, Daniel Bifield, Beverly Davis, William McDermott, Thomas Harrison, Robert L. Sizemore, and Barry Spell with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). The case against Spell was transferred to the United States District Court for the District of Nevada pursuant to Fed. R.Crim.P. 20. Spell entered a plea of guilty to the conspiracy charge and was sentenced to a period of incarceration of 63 months, to be followed by a 3–year term of supervised release. Sizemore entered a plea of guilty to Count One of the indictment on December 4, 1997. Janet Bifield entered a plea of guilty to Count One on January 26, 1998.

On June 24, 1998, a grand jury sitting in the Middle District of Pennsylvania returned a superseding indictment charging the same offense against defendants Daniel Bifield, Davis, McDermott, Harrison, and Stephen Montgomery. Harrison entered a plea of guilty to Count One on September 30, 1998. Montgomery entered a plea of guilty to Count One on October 1, 1998. Only Daniel Bifield, Davis, and McDermott proceeded to trial, and all three were found guilty by a jury on November 9, 1998.

Defendant Diane Oberley was charged separately under § 1956(h) by information filed December 12, 1996, and entered a plea of guilty on January 13, 1997. Defen-

dant Erica Rowlands was charged under § 1956(h) by information filed January 14, 1997, and entered a plea of guilty on February 11, 1997.

Pre-sentence reports were ordered and obtained for each defendant.

Between January 29 and March 19, 1999, the court heard evidence and argument related to the objections to the PSR's, and any motions for upward or downward departures from the imprisonment range as determined under the Sentencing Guidelines. Sentencing was deferred pending hearing all of this evidence and argument, so that the court would have complete information available and so that the sentences imposed would be consistent among the co-defendants/co-conspirators. This memorandum is issued for the purpose of resolving the divers issues raised.

## B. Nature of the Scheme to Defraud

The originators of the underlying scheme appear to be two federal inmates named Rodney Archambeault and Anthony Pfeffer. The basic idea was to file false income tax returns with authorities in the States of Ohio and California for which refund checks would issue. The primary problems of such a scheme are avoiding detection by tax authorities in those states and depositing or cashing the checks once they are received, since an inmate obviously would not be employed full-time.

To avoid the "red flags" which would be raised, the inmates would use real Social Security numbers of persons outside the prison system on the false returns, and would prepare false IRS Forms W–2 using the tax identification numbers of actual Fortune 500 companies. Also, they would obtain demographic information from public offices which would indicate reasonable incomes and refunds of persons living in the locales from which the false returns were purported to originate. The schemers made sure to use the right forms, and even made sure that the returns were filed at the time of year best suited to avoid detection. As noted, the level of sophistication was remarkable.

To maximize their ability to capitalize on the fraud, the inmates needed Social Security numbers and their accompanying identities. Archambeault and Pfeffer therefore recruited other inmates who participated by preparing fraudulent returns and by obtaining more Social Security numbers. They did this at the various Bureau of Prisons institutions in which they were incarcerated. One investigator described the pair as a "cancer" within these facilities, an apt description.

One of the institutions to which Archambeault and Pfeffer were designated by the BOP was the United States Penitentiary at Allenwood, one of the facilities within the Federal Corrections Complex at Allenwood, located in White Deer, Union County, Pennsylvania. There, other inmates joined the scheme, including Daniel Bifield, Thomas McDermott, Mark Conway, David Hammer, Michael Sizemore, Wayne Bridgewater, Arthur Hill, and William Burke. People outside the institution, usually the inmates' family members who were not incarcerated, were recruited to cash refund checks, to deposit the checks into existing bank accounts, or to open new bank accounts for the purpose of obtaining cash for the fraudulently obtained refund checks.

The general pattern of distribution of the proceeds was to be ⅓ for Archambeault and Pfeffer, ⅓ for the person who cashed the check, and ⅓ for the inmate who coordinated the financial transactions. Of course, given the nature of the scheme, the participants did not adhere strictly to this general plan.

Once a check was received, it would be deposited or cashed, or otherwise negotiated so as to produce cash, by a person on the outside of the institution. The proceeds would be distributed using postal money orders, other money orders, wire transfers, etc., and also the deposit of proceeds into the commissary accounts of the inmate conspirators. To facilitate the of-

fense, the conspirators used the mail, including legal mail, to and from USP–Allenwood, and made telephone calls (using guarded language) regarding the scheme from the penitentiary.

As necessary, relevant conduct of the individual defendants to be sentenced will be discussed in the proper context.

## II. BASE OFFENSE LEVEL

A problem common to the defendants is the base offense level for conspiracy to commit money laundering. For most of the defendants, the Probation Office recited a base offense level under the Guidelines of 23. The source for this figure is USSG § 2S1.1(a)(1), which provides that the base offense level is 23 if the defendant is convicted under § 1956(a)(1)(A), (a)(2)(A), or (a)(3)(A).[1] Otherwise, the base offense level is 20. USSG § 2S1.1(a)(2). The first question is which of these figures applies. Second, we must determine whether a departure from either of these base offense levels is appropriate as significantly overstating the seriousness of the offense.

Defendants were charged with conspiracy to violate both § 1956(a)(1)(A)(i) and (B)(i), which provide:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

. . .

(B) knowing that the transaction is designed in whole or in part-

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the pro-

ceeds of specified unlawful activity;

. . .

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1). Succinctly stated, the difference is money laundering to further the underlying criminal activity versus money laundering to avoid detection of the underlying criminal activity. The problem lies in the fact that the base offense level is higher under (A)(i) than under (B)(i) (23 versus 20).

■ Davis, in a brief joined by all of the other defendants save Rowlands (who waived a pre-sentence hearing), argues that the court must find beyond a reasonable doubt that the intent of the conspiracy was to promote the tax fraud scheme before the higher base offense level applies. We disagree, although as discussed below this necessary conclusion is not particularly logical; we reach our conclusion based on the language of the Guidelines.

The first applicable Guidelines provision reads:

A conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit.

USSG § 1B1.2(d). The Sentencing Commission elaborated on that provision as follows:

Particular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict

---

1. Defendants were convicted of conspiracy under § 1956(h). The Guideline related to conspiracy, USSG § 2X1.1(a), indicates that

the Guideline for the underlying offense controls.

the defendant of conspiring to commit that object offense. Note, however, if the object offenses specified in the conspiracy count would be grouped together under § 3D1.2(d) (*e.g.*, a conspiracy to steal three government checks) it is not necessary to engage in the foregoing analysis, because § 1B1.3(a)(2) governs consideration of the defendant's conduct. USSG § 1B1.2, comment. (n.5).[2]

In this instance, offenses for which § 2S1.1 applies are grouped under § 3D1.2(d); in fact, they are specifically listed as offenses to be grouped. By the terms of Application Note 5 to § 1B1.2 and § 3D1.2(d), the money laundering offenses are grouped and the court does not distinguish between the objects of a money laundering conspiracy. By operation of the grouping rules, the highest offense level (23) applies. USSG § 3D1.3(b).

The failure in the logic of this approach arises from the fact that the different base offense levels under § 2S1.1 exist because a defendant convicted under the subsections as to which the higher base offense level applies "encouraged or facilitated the commission of other crimes." USSG § 2S1.1, comment. (backg'd.). By grouping the offenses, the purpose for which separate base offense levels were created is not fulfilled. Most importantly, the intent of the Guidelines section is prevented from being achieved merely by the recitation of a conspiratorial aim in an indictment, not because it has been proven.

Stated another way, the purpose of grouping different counts is to prevent multiple sentences for substantially the same harm. USSG Ch. 3, Pt. D, intro. comment. Preventing detection and furthering additional criminal conduct, however, are separate harms. Grouping these offenses merely because a conspiracy has been charged, and thus applying the higher base offense level, without examining whether the defendant's conduct reflects the intent relative to the higher base offense level, defeats the purpose of the grouping rules. However, this is the result of the plain language of the Guidelines.

In a case such as this, for instance, it may well be proven by the government that there was a conspiracy to conceal the source of unlawfully acquired funds without proving that the conspirators also intended to promote carrying on of the unlawful activity. However, by charging the latter, and by obtaining a verdict of guilty as to conspiracy generally, the government in effect dictates that the higher offense level will apply, regardless of the actual conduct of the defendant.

This result conflicts with a number of other Guidelines provisions. First, it is contrary to the stated purpose of the Guidelines to impose a sentence based on the actual conduct of the defendant. *See generally* USSG § 1B1.3, comment. (n.1). Second, it conflicts with the introductory commentary language of Chapter 3 of the Guidelines cited above and the introductory language of § 3D1.2, which indicates that counts are grouped when they "involv[e] substantially the same harm." Finally, it conflicts with the example provided in Application Note 5 to § 1B1.2 (quoted above), in which the separate offenses were the theft of 3 different government checks, which is consistent with the opening language of § 3D1.2.

It appears that this may be an instance in which a departure may be warranted, since the conflicting result obtained by following the language of § 3D1.2(d), as opposed to the policy of the Guidelines and the introductory language of § 3D1.2, does not appear to have been a matter adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. *See* USSG § 5K2.0.

The evidence produced at trial by the government indicated that relatively minor

---

2. As relevant, USSG § 1B1.3(a)(2) provides that the base offense level and adjustments thereto are determined on the basis of the defendant's relevant conduct, which includes any course of conduct or common plan or scheme as the offense of conviction.

sums were expended for the purpose of promoting the carrying on of the tax fraud scheme. For the most part, the expenses were for mailing, buying money orders, and telephone bills. Most of the transactions involved cashing the refund checks and converting the cash into money orders for distribution, both of which activities would disguise the source and ownership of the funds. It is true that the conduct of the schemers technically was within the scope of § 1956(a)(1)(A)(i), but the conduct more properly falls within § 1956(a)(1)(B)(i). The "promotion" conduct really was incidental or tangential to the "disguise" conduct. We therefore will depart from the total offense level by 3 levels, representing the difference between a base offense level of 23 and the more appropriate base offense level of 20.

In addition, Rowlands and Oberley entered guilty pleas to violating § 1956(a)(1)(B)(i), so that the lower base offense level of 20 applies. We conclude that it would be fundamentally unfair to deprive these defendants of the benefit of their plea agreement with the government, a factor not taken into consideration by the Guidelines. That is, Rowlands and Oberley negotiated plea agreements that gave them a base offense level three points lower than the other conspirators indicted in this court. We have deferred sentencing and held pre-sentence hearings for the purpose of consistency in the sentences to be imposed.

The Guidelines do not address the need for consistency among co-conspirators or defendants in related cases. *But see United States v. Tally,* 920 F.Supp. 597, 606 (M.D.Pa.1996)(unfair to impose longer sentences on defendants with lesser role in schemes to grow marijuana and to obstruct investigation and prosecution), *aff'd sub nom. United States v. Vancuren,* 111 F.3d 128, 1997 WL 173170 (3d Cir.1997)(table). The closest statement is found in USSG Ch. 6, Pt. B, intro. comment., which provides that plea negotiation practices should not be allowed to perpetu-ate unwarranted sentencing disparity. We conclude that preserving the "benefit of the bargain" for a defendant is a proper basis for a downward departure under USSG § 5K2.0 as a factor not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. We therefore will depart 3 levels from the Total Offense Levels of Rowlands and Oberley.

■ Davis also argues at length that the court should depart from the Guidelines because the offense committed by these defendants does not fall within the heartland of money laundering cases. She cites a number of cases in which courts have departed for this reason, and also relies on a report by the Sentencing Commission related to money laundering offenses. *Report to the Congress: Sentencing Policy for Money Laundering Offenses, including Comments on Department of Justice Report* (as directed by section 2(b) of Public Law 104–38) (September 18, 1997). In that report, the Sentencing Commission concluded that the Guidelines relating to money laundering should be revised because of the disparity of conduct among offenders receiving similar, lengthy sentences. Davis argues that the money laundering statutes were intended to attack organize crime and large-scale drug traffickers, not marginal participants in tax fraud schemes.

The first problem with this entire line of reasoning is that the Sentencing Commission's recommendation that the Guidelines be "recalibrated" for money laundering offenses was rejected by Congress. Pub.L. No. 104–38, § 1, 109 Stat. 334 (October 1, 1995). In *United States v. Woods,* 159 F.3d 1132, 1134–1136 (8th Cir. 1998), the Eighth Circuit reviewed both the recommendations and Congress' reaction thereto. Congress concluded that the past sentencing anomalies in a few money laundering cases did not warrant a sweeping adjustment in the Sentencing Guidelines. It did not suggest that downward departures in instances of money

laundering outside the heartland were not appropriate. *Id.* at 1135. Congress also directed further study of the problem, particularly with respect to achieving uniformity in the use of the money laundering as a charging device. The general idea is that the money laundering statutes are not to be used as a means of increasing the penalty for simple "receipt and deposit" cases, "those in which the money laundering conduct is limited to depositing the proceeds of unlawful activity in a financial institution account identifiable to the person who committed the underlying offense." *Id.* at 1135.

In contrast to the type of case described in *Woods,* this case involves a complex scheme of tax fraud, not a "receipt and deposit" case. The money laundered was deposited or cashed for such purposes as distancing the funds from the state-issued refund checks and to pay the participants in the scheme. Bank accounts were opened specifically for that purpose, and the checks were made out to third parties. The actual perpetrators of the underlying fraud generally were not the recipients of the checks. They (the fraud perpetrators) benefitted after the funds had gone through several transactions, such as deposit and cash withdrawal, or direct exchange for cash, division among the money laundering conspirators, then money orders, further deposits (including into prison commissary accounts), etc.

In addition to the foregoing, we note that the charged offense of conspiracy to commit money laundering stands apart from the tax fraud scheme, based on the process described immediately above. We also note that the argument propounded by Davis actually seems to be rather self-defeating. The contention is that there are a large number of cases outside the heartland of money laundering which led to reconsideration of whether the base offense levels under the Guidelines are appropriate. If there are so many cases outside the heartland, the heartland must be larger than originally recognized, and so such cases either have become part of the heartland, or the heartland has grown. Also, the argument that these cases do not fit within the legislative intent behind the money laundering statute is flawed because Congress did not limit money laundering to organized crime and drug trafficking cases. The statutory language is unambiguous, and therefore an analysis of congressional intent is unnecessary and inappropriate.

This issue was addressed recently by the Court of Appeals for the Third Circuit in *United States v. Morelli,* 169 F.3d 798 (3d Cir.1999)(opinion filed after brief by Davis). That opinion is relevant initially in its discussion of the sufficiency of the evidence of a wire fraud scheme, which in turn supported a charge of money laundering. Because wire transactions performed after the receipt of funds were intended to make detection of the fraud more difficult, the transactions both constituted the "wire" element of wire fraud and constituted a financial transaction with the proceeds of unlawful activity (the wire fraud). The Third Circuit concluded that the district court properly sentenced the defendants under the money laundering Guidelines. *Id.* at 808–809. Thus, as in this case, an overlap in the transactions as an element of the underlying offense or to obtain the benefit of the underlying offense does not preclude consideration of the transactions as money laundering.

Also, in a footnote, the Third Circuit addressed an argument by a defendant that the proposed amendments to the Guidelines reflected the Sentencing Commission's view that his conduct was not within the "heartland" of the Guidelines.[3]

---

3. The same defendant argued that he was entitled to a downward departure because the government manipulated the indictment by charging him with money laundering. The district court exercised its discretion in denying the downward departure, an exercise over which the Third Circuit did not have jurisdiction. *Id.* at 809 n. 13. We also reject a similar argument by defendants, who contend that the Guideline provisions related to fraud

The Third Circuit noted first that the district court did not err when it rejected the argument because the proposed amendments to the Guidelines do not provide independent legal authority for a downward departure. *Id.* at 809 n. 13.

A case cited by the Third Circuit in *Morelli* was *United States v. Anderson,* 82 F.3d 436 (D.C.Cir.), *cert. denied,* 519 U.S. 956, 117 S.Ct. 375, 136 L.Ed.2d 264 (1996), in which the defendant argued that proposed amendments to the Guidelines, also rejected by Congress, related to crack cocaine, provided a basis for a downward departure. The D.C. Circuit held that a departure was not available on such a basis because the factor (disparity in sentencing between crack cocaine and powder cocaine) had been considered by the Sentencing Commission, a fact evidenced by the proposed amendment itself. We agree that a downward departure does not appear to be available, since the question of whether the money laundering Guidelines apply when there is no drug trafficking or organized crime implicated has been considered, as evidenced by the very report to which defendants cite.[4]

Another factor to be considered in the instant case is the incarceration of the primary participants in the tax fraud scheme. The tax fraud scheme and laundering of the proceeds entailed use of the prison telephones, mail, and, most seriously, the legal mail. The government relied, in part, on the impact of the use of these facilities and privileges in supporting its position that upward departures are warranted in these cases for disruption of a governmental function. While we do not

agree that the impact was sufficient to warrant a departure, we believe that the conduct of the defendants in abusing these privileges and facilities, along with their willingness to cooperate with inmates engaging in further criminal behavior, negates any justification for a downward departure based on an offense level which overstates the seriousness of the offense, at least relative to a departure beyond the 3–point departure discussed above. That is, presuming that a downward departure is available (a presumption we reject), the exercise of our discretion is to reject any such departure.

In short, we conclude that an across-the-board departure to reduce the effect of the high base offense level for money laundering is unwarranted in the circumstances of this case. To paraphrase counsel for the government, "sticker shock" is not a basis for a downward departure.

### III. INDIVIDUAL OBJECTIONS AND DEPARTURE MOTIONS

#### A. Beverly Davis

##### (i) Objections to the Pre–Sentence Report

Beverly Davis objects to the recitation of the offense conduct in the PSR. The jury found her guilty based on evidence which supports the recitation. We find that the PSR accurately recites the facts of the case. The only amendment we make is that the PSR should read "Diane Oberley and Erica Rowlands" in place of "Diane Oberley and Beverly Davis," as conceded by the government. PSR at 6 ¶ 14 ln. 8.

---

should apply. These defendants engaged in further activity after the fraud was complete. Moreover, the abuse of the phone and legal mail privileges at the institutions and the simple fact that these defendants chose to involve themselves in an ongoing scheme with inmates militate against any such departure. *See* discussion following discussion of *Morelli.*

4. Also supporting this conclusion is the structure of § 2S1.1. The Guideline provides for an enhancement of 3 points if the funds were

derived from narcotics trafficking. Sec. 2S1.1(b)(1). Also, if the amount involved is $100,000.00 or less, there is no increase in the offense level for the value of the funds. Sec. 2S1.1(b)(2)(A). Thus, relative to USSG § 2F1.1, for which the offense level is enhanced for amounts over $2,000.00, the conduct considered minor enough not to warrant enhancement for purposes of money laundering is much broader, indicating that a broad scope of minor activity is implicated.

■ Davis objects to ¶¶ 25, 29 of the PSR, which state that she is not entitled to a downward adjustment of her offense level for acceptance of responsibility under USSG § 3E1.1. She contends that she truthfully admitted all of her conduct regarding the tax fraud and money laundering schemes, despite going to trial and putting the government to its burden of proof. This argument is devoid of merit for a number of reasons, but one reason will suffice for present purposes. When interviewed by the FBI on October 12, 1995, Davis stated that she was aware of the tax fraud scheme. Government's Brief in Opposition to Davis' Objections to the PSR, Exhibit A, Report of Interview of 10/12/95, at 1. When interviewed on April 1, 1996, Davis stated only that she thought that something illegal might be occurring but did not see how inmates could commit such an offense while incarcerated. *Id.*, Report of Interview of April 1, 1996, at 3. Davis plainly was not being forthright about her knowledge of the matter, which in turn impacts the inferences regarding her intent, a point she contested by going to trial.

■ Finally, Davis objects to PSR ¶ 29 and seeks a 4–point downward adjustment for minimal role in the offense. Davis' argument in this regard generally relates to her role in the tax fraud scheme. In this respect, we look at the overall scheme, not just the money laundering. Davis was hardly a participant at the level of Archambeault, Pfeffer, and some of the other inmates who created the scheme and prepared the false returns for filing, provided directions to others on how to conduct the scheme, etc. However, she did recruit Oberley and Rowlands, and her role allowed the successful completion of the scheme. The offense level will be adjusted downward 3 points for a role between "minor" and "minimal" under the Guidelines.

■ The government seeks an upward adjustment for use of a minor to commit the offense under USSG § 3B1.4. Jennifer McDermott, then 16, was used as a recipient of the tax refund checks. Thomas McDermott instructed Davis to pick up the checks from Jennifer. This is not an indication that Davis "used" Jennifer to commit the offense; Thomas McDermott did. Also, Wayne McDermott participated with Jennifer in cashing one of the checks, but declined to do so thereafter because he was suspicious. The statement Wayne provided to the FBI does not indicate that Davis used him in any way. No adjustment for use of a minor is warranted.

## (ii) Departure Motions

■ Davis seeks a downward departure from the Guidelines for several reasons. Discussed above is her motion related to the base offense level. Davis also seeks a downward departure for her unique family ties and responsibilities, which ordinarily is not a proper basis for a departure. USSG § 5H1.6. There are limited circumstances in which such a departure is appropriate, however, given that leaving a family behind is a common hardship for convicted parents. *United States v. Monaco*, 23 F.3d 793, 801 (3d Cir.1994). The family ties must be exceptional to warrant a departure on this basis, *id.; United States v. Artim*, 944 F.Supp. 363, 369 (D.N.J.1996), and the departure must be such as would relieve the situation. *Monaco* at 801–802 (contrasting situation in which a departure from a long sentence was not reasonable with situation in which a reasonable departure would allow a defendant to quickly return to family duties).

In this case, Davis is facing a considerable period of incarceration because the offense is viewed seriously by Congress and the Sentencing Commission. A major departure would be necessary before the desired result could be achieved. Davis faces a further period of incarceration based on the violation of her supervised release. That Davis has offended previously raises the further question of whether it is appropriate to grant a departure on this basis for a repeat offender.

We will deny the motion for a downward departure based on family ties. In so doing, we do not minimize the condition faced by her son, Thomas McDermott. He plainly has a very serious condition and a difficult life ahead of him, with or without his mother. We simply do not believe that a departure from the Guidelines will alleviate that situation.

### B. William McDermott

#### (i) Adjustments

As with Davis, we adopt the factual findings recited in the PSR, with one amendment. The PSR should read "Thomas McDermott told William McDermott" in place of "William McDermott told Thomas McDermott" at one point. PSR at 5 ¶ 12 ln. 1.

■ William McDermott seeks a downward adjustment for acceptance of responsibility. His testimony at the sentencing hearing conflicts with trial testimony; in fact, if his testimony were credited, he would not be guilty of the offense, a conclusion plainly at odds with the jury's verdict. Also, McDermott admittedly tried to mislead investigators when first asked about the offense, and put the government to its burden of proof at trial. An adjustment for acceptance of responsibility is not warranted in these circumstances.

McDermott also seeks a 4–point downward adjustment for minimal role in the offense. Again, we look at the overall scheme. As with Davis, McDermott was important, though not crucial, to the success of the scheme because he was not incarcerated. However, he did not recruit others, and so a 4–point adjustment will be made.

Finally, McDermott objects to the 2 points added in his Criminal History computation for a first-time DUI conviction on February 15, 1985, since his involvement in the offense cannot be said to have begun before June of 1995, or more than ten years after the conviction. *See* USSG § 4A1.2(e)(2). After a check of its file, the government conceded that it did not have evidence of McDermott's participation before that period. Instead, it relied on the fact that the scheme began in December, 1994. Under § 4A1.2(e)(2), it is the *defendant's* commencement of the offense that ends the period of time counted. Also, even if the prior time were countable based on co-conspirators' activities, there is no evidence that such activities were foreseeable by McDermott before June, 1995. We agree with McDermott that no points should be added for the offense stated in the PSR at 11 ¶ 38, and the total points are 6, for a Criminal History Category of III.

The government's objection to the PSR for not including an adjustment for use of a minor was withdrawn at the sentencing hearing.

#### (ii) Departures

The government, as it did with Davis, moves for an upward departure for interference with a governmental function. Again, we do not believe that any conduct on the part of McDermott rose to that level, but supports our conclusion that a downward departure for a base offense level which substantially overstates the seriousness of the offense is not warranted.

### C. Stephen Montgomery

Stephen Montgomery objects to the failure to apply the four-point downward adjustment for role in the offense. For the reasons discussed above, the adjustment will be made. However, also for the reasons discussed above, Montgomery's motion for a downward departure because the case is not a heartland case of money laundering is denied.

### D. Daniel Bifield

#### (i) Objections

At the time of his sentencing hearing, Daniel Bifield withdrew his objection to the use of a base offense level of 23, and so that objection will not be considered further.

■ Daniel Bifield objects to those portions of the PSR which recite conduct which Janet Bifield perceived to be threatening. At the sentencing hearing, Janet Bifield did not testify. Instead, the government introduced FD–302's related to interviews of Debbi S. Mumford, a friend of Janet's. Mumford encountered members of the Hell's Angels Motorcycle Club who were sent by Daniel Bifield to find Janet. Daniel Bifield contends that the gang members were sent only to find out Janet's situation relative to the investigation and to make sure that she was all right. The men sent by Daniel Bifield did not locate Janet Bifield, but did talk to Mumford. The government contends that a visit from such people would hardly constitute a friendly meeting. While we normally would agree, the fact is that the Bifields (including Janet's own family) and Mumford were members and associates of the Hell's Angels, so that a presumption that the members were sent to intimidate Janet is unwarranted. No other evidence being present that any action by Daniel Bifield was intended to intimidate witnesses, an adjustment for obstruction of justice is inappropriate and we will not do so.

The objection related to the amount of the loss will not be addressed, since it does not affect the offense level.

Daniel Bifield objects to a 2–point increase under USSG § 3B1.1(c) for directing the activities of Janet Bifield. Daniel Bifield's argument in this respect is limited to the time period between August and October, 1995, during which time he says that Janet acted independently, and to the fact that he did not "control" Janet's activities.

As to the latter, control is just one of the factors which may warrant the increase. *See* USSG § 3B1.1, comment. (n. 4). The record reflects the facts that Daniel Bifield recruited Janet and instructed her on how to go about committing the offense. That he did not control her every action is immaterial; coercion is not necessary before

the increase is appropriate. We believe that it is appropriate in this instance.

The next objection is the failure to decrease the offense level by 2 points for acceptance of responsibility. Daniel Bifield put the government to its burden of proof, and did not make any statement admitting his conduct. Rather, he relies on an offer in plea negotiations to plead guilty to a mail fraud charge, as opposed to money laundering. We do not agree that an offer to plead to a lesser charge constitutes acceptance of responsibility.

At the sentencing hearing, counsel for Daniel Bifield indicated that the objection to the imposition of a consecutive sentence was raised for purposes of appeal. It is obvious that this court must impose a consecutive sentence under USSG § 5G1.3(a) and § 5G1.3, comment. (n. 1). *See United States v. Higgins,* 128 F.3d 138 (3d Cir.1997)(sentencing court must impose sentence to run consecutively to any previously imposed sentence when instant offense committed while defendant serving a term of imprisonment).

### (ii) Departure Motions

Daniel Bifield's contention with respect to a downward departure from the money laundering base offense level is denied for the reasons recited above. The motion for a departure from a Criminal History Category of V is denied for the reasons recited by the Probation Officer in the PSR.

As to the government's motion for an upward departure for disruption of a governmental function, we believe that the resulting Guidelines range adequately reflects the seriousness of the offense conduct, and that no substantial disruption occurred (though one was threatened). The court will not depart upward from the Guidelines range.

### E. Erica Rowlands

Erica Rowlands does not object to the PSR, and the government neither raises an objection to her PSR nor moves for an upward departure. Motions by the gov-

ernment for downward departure for substantial assistance for Rowlands, Janet Bifield, Robert Sizemore, and Diane Oberley will be discussed below.

### F. Thomas Harrison

A 3–point downward adjustment will be applied to the offense level for Thomas Harrison, for the reasons discussed above. We note that Harrison does not object to the number of levels.

 At the time of the pre-sentence hearing, the court related to Harrison and his counsel that we believed that the PSR accurately reflects a Criminal History Category of II, a point which Harrison appeared to concede. Harrison initially objected to the counting of a conviction for driving while intoxicated for which he was sentenced in New York to a $100.00 fine and a "conditional discharge." The applicable Guidelines provision states that all felonies are counted, as are other offenses unless excluded. USSG § 4A1.2(c). DWI is not one of the "minor traffic infractions" excluded under § 4A1.2(c)(2). USSG § 4A1.2, comment. (n.5). Also, DWI is not similar to one of the offenses listed in § 4A1.2(c)(1)(B). Finally, a term of conditional discharge under New York law lasts at least one year, N.Y. PENAL LAW § 65.05(3)(period of conditional discharge to be three years for felony and one year for misdemeanor or violation); *People v. Pabon,* 119 A.D.2d 446, 500 N.Y.S.2d 132 (1986)("allowable period" of conditional discharge for misdemeanor is one year), *leave to appeal denied,* 67 N.Y.2d 1055, 495 N.E.2d 364, 504 N.Y.S.2d 1031 (1986)(table), and constitutes unsupervised probation. *See* § 65.05(1)(McKinney 1994)(conditional discharge may be imposed when neither public interest nor ends of justice served by incarceration and probation supervision not appropriate); N.Y. PENAL LAW § 410.10, Practice Commentaries (distinction between probation and conditional discharge is that adherence to conditions of probation supervised by probation department). Conditional supervision which is analogous to unsupervised probation is

"probation" for purposes of § 4A1.2(c). *United States v. Lloyd,* 43 F.3d 1183, 1187–1188 (8th Cir.1994). Harrison's DWI conviction in 1988 was properly counted in determining his Criminal History Category.

Harrison also contends that a Criminal History Category of II overstates the seriousness of his prior record. We disagree: He has a number of convictions not counted, and there is a consistency of alcohol-related misconduct. No downward departure related to the Criminal History computation is warranted.

We see no other factor rising to the level at which a downward departure is warranted.

### G. Diane Oberley

Diane Oberley has no objections to her PSR, but moves for a downward departure based on the offense level, discussed above. For the reasons discussed above, the motion will be denied.

### H. Janet Bifield

Janet Bifield has no objections to her PSR, but moves for a downward departure based on the offense level, discussed above. For the reasons discussed above, the motion will be denied.

### I. Robert Sizemore

The court notes one typographical error in the PSR prepared for Robert Sizemore. On page 4, under the caption "Related Cases," the case number for Rowlands should read, "4:CR–97–0011," not "4:CR–96–311."

In his sentencing brief, Sizemore adds several arguments to those recited by Davis in her brief supporting the motion for a downward departure from the money laundering Guidelines. The first of these is that Sizemore was the "last sucker on the end of the tentacle" of the "octopus with regenerative tentacles" that was the tax fraud/money laundering scheme. The defendants' locations on the tentacles are addressed by our adjustments for role in

the offense, and we see no reason for further departure or adjustment.

Sizemore next contends that the government did not follow its own guidelines in prosecuting the case under the money laundering statute. Internal operating procedures of the Department of Justice do not confer substantive rights on defendants. *See United States v. Pungitore*, 910 F.2d 1084, 1120 (3d Cir.1990)(government's *"Petite* policy" does not confer substantive rights on defendants relating to double jeopardy and dual sovereigns doctrine), *cert. denied*, 500 U.S. 915, 111 S.Ct. 2010, 114 L.Ed.2d 98 (1991); *United States v. Stansfield*, 874 F.Supp. 640, 647 (M.D.Pa.1994)(U.S. Attorney's Manual did not create substantive rights relating to counsel's conflict of interest, citing *Pungitore* ).[5] The basic question remains whether the base offense level for money laundering overstates the seriousness of the offense, an issue addressed above and answered in the negative, at least as to a base offense level of 20. We emphasize that we do not believe that a downward departure is the appropriate context for review of a decision to prosecute.

One point discussed in Sizemore's brief with which we wholeheartedly agree is the perplexity with which one must view the willingness of "otherwise upstanding people who do idiotic things at the behest of inmates." Defendant's Sentencing Brief at 8. In the end, however, being "suckered" by inmates excuses criminal behavior no more than such behavior arising from mixing with a bad crowd.

At the sentencing hearing, Sizemore withdrew his motion for a downward departure as it related to coercion and duress, and we will address the issue no further.

Sizemore also seeks a downward adjustment for his role in the offense. We agree, and will adjust downward 3 points.

## IV. GOVERNMENT'S MOTIONS TO DEPART FOR SUBSTANTIAL ASSISTANCE

The government has filed motions for downward departures for substantial assistance to authorities under USSG § 5K1.1. These motions include suggested number of levels of departure of 3 for Janet Bifield, 1 for Robert Sizemore, 4 for Erica Rowlands, and 5 for Diane Oberley. The court must not only consider the government's evaluation of the assistance rendered, § 5K1.1(a)(1), but must give "substantial weight" to the government's view. USSG § 5K1.1, comment. (n.3).

The only serious argument as to the levels recommended by the government is raised by Sizemore, who characterizes the 1–point departure as "miserly." Having heard the testimony of Sizemore at trial, we must agree with counsel for the government that the effort to extract evidence was like pulling teeth.[6] Although Sizemore notes the difficulty of testifying against one's brother, we note that Michael Sizemore was not a defendant in the proceedings in this court. A prime example of the difficulty to which the government refers is Sizemore's failure to identify his own signature on a money order. A 1–level departure appropriately reflects the cooperation provided.

---

**5.** The judgment of conviction and sentence in *Stansfield* has been the subject of further litigation. The original conviction was vacated in part; at a second trial, the defendant again was found guilty. One count of conviction has been set aside, and resentencing is pending. None of the additional opinions affects the holding of the opinion cited above. *See United States v. Stansfield*, 886 F.Supp. 443 (M.D.Pa.1995); *United States v. Stansfield*, 101 F.3d 909 (3d Cir.1996); *United States v.*

*Stansfield*, 1999 WL 140948 (3d Cir. Mar.16, 1999).

**6.** Counsel for the government stated at the sentencing hearing that he felt that he needed a D.D.S. degree more than a J.D. Both government and defense counsel are to be commended for their creativity in providing analogies, similes and metaphors for the court's benefit.

## VI. CONCLUSION

The defendants' motions for a downward departure will be granted in part and denied in part. The court will apply the lower base offense level of 20 for money laundering, but will not depart from the Guidelines otherwise for a base offense level which overstates the seriousness of the offense.

The disposition of various objections raised and motions made by defendants are summarized in a chart appended to this memorandum, as are the government's objections and motions. Moreover, a table reflecting our disposition of these matters and the resulting sentencing ranges is appended.

## APPENDIX

### Table 1

| Defendant | BOL | Role Adjustment | AOR | TOL | Criminal History Category | Guideline Range | Departure Levels 5K2.0 | Departure Levels 5K1.1 | Final Offense Level | Final Range |
|---|---|---|---|---|---|---|---|---|---|---|
| Janet Bifield | 23 | −3 | −3 | 17 | II | 27–33 | 3 | 3 | 11 | 10–16 |
| Daniel Bifield | 23 | +2 | 0 | 25 | V | 100–125 | 3 | | 22 | 77–96 |
| Beverly Davis | 23 | −3 | 0 | 20 | IV | 51–63 | 3 | | 17 | 37–46 |
| William McDermott | 23 | −4 | 0 | 19 | III | 37–46 | 3 | | 16 | 27–33 |
| Thomas Harrison | 23 | −3 | −3 | 17 | II | 27–33 | 3 | | 14 | 18–24 |
| Robert Sizemore | 23 | −3 | −3 | 17 | I | 24–30 | 3 | 1 | 13 | 12–18 |
| Stephen Montgomery | 23 | −4 | −3 | 16 | I | 21–27 | 3 | | 13 | 12–18 |
| Erica Rowlands | 20 | −4 | −3 | 13 | I | 12–18 | 3 | 4 | 6 | 0–6 |
| Diane Oberley | 20 | −4 | −3 | 13 | I | 12–18 | 3 | 5 | 5 | 0–6 |

BOL=Base Offense Level
AOR=Acceptance of Responsibility
TOL=Total Offense Level

### Table 2

*Beverly Davis*

(1) Motion for downward departure for offense level which overstates seriousness of offense: Granted to extent of applicability of base offense level of 20, rather than 23, so that a 3–level departure applies; denied otherwise

 (disposition applicable to all defendants)

(2) Objection to recitation of offense conduct: Overruled.

(3) Objection to failure to grant reduction for acceptance of responsibility: Overruled.

(4) Objection to failure to grant 4–point reduction for minimal role in the offense: Sustained in part, 3–level reduction applied.

(5) Motion for downward departure for family ties and responsibilities: Denied.

(6) Government's objection to failure to grant upward adjustment for use of a minor to commit the offense: Overruled.

(7) Government's motion for an upward departure for interference with a governmental function: Denied.

### William McDermott

(1) Objection to failure to grant reduction for acceptance of responsibility: Overruled.

(2) Objection to recitation of offense conduct: Overruled.

(3) Objection to failure to grant 4–point downward adjustment for minimal role in the offense: Sustained.

(4) Objection to counting of February 15, 1985, conviction for purposes of determining Criminal History Category: Sustained.

(5) Government's motion for an upward departure for interference with a governmental function: Denied.

### Stephen Montgomery

(1) Objection to failure to grant 4–level reduction for minimal role in the offense: Sustained.

### Daniel Bifield

(1) Objection to recitation of offense conduct: Overruled.

(2) Objection to adjustment for obstruction of justice: Sustained.

(3) Objection to the amount of the loss: Not addressed as it does not affect sentencing. Fed.R.Crim.P. 32(c)(1).

(4) Objection to 2–point enhancement for directing the activities of Janet Bifield: Overruled.

(5) Objection to failure to apply downward adjustment for acceptance of responsibility: Overruled.

(6) Objection to imposition of a consecutive sentence: Overruled.

(7) Government's motion for an upward departure for disruption of a governmental function: Denied.

(8) Motion for downward departure because Criminal History Category overstates seriousness of prior record: Denied.

### Erica Rowlands

(1) No objections.

(2) Government's motion for a 4–level downward departure for substantial assistance: Granted.

### Thomas Harrison

(1) Objection to counting of conviction for which sentence of conditional discharge was imposed: Overruled.

(2) Motion for downward departure because Criminal History Category overstates the seriousness of prior record: Denied.

(3) Motion for downward departure for specified factors: Denied.

### Diane Oberley

(1) No objections.

(2) Government's motion for a 5–level downward departure for substantial assistance: Granted.

### Janet Bifield

(1) No objections.

(2) Government's motion for a 3–level downward departure for substantial assistance: Granted.

### Robert Sizemore

(1) Objection to failure to grant reduction for role in the offense: Sustained, 3–level adjustment applied.

(2) Government's motion for a 1–level downward departure for substantial assistance: Granted.

(3) Objection to limiting motion for downward departure to 1 level: Overruled.

Any objection or motion the favorable disposition of which is not reflected in Table 1 is implicitly overruled or denied.