# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 98-1884WM

_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | On Appeal from the United |
| v. | * | States District Court |
| | * | for the Western District |
| | * | of Missouri. |
| Nanci Carter Woods, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: September 22, 1998

Filed: November 5, 1998

_____

Before RICHARD S. ARNOLD, WOLLMAN, and KELLY,[1] Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.

Pursuant to an agreement with the United States, Nanci Carter Woods pleaded guilty to one count of bankruptcy fraud under 18 U.S.C. § 152 and one count of money laundering under 18 U.S.C. § 1957. The District Court[2] sentenced Ms. Woods to a

_____

[1]Judge Kelly died on October 21, 1998. This opinion is consistent with the vote he cast at conference on this case.

[2]The Hon. Russell G. Clark, United States District Judge for the Western District of Missouri.

three-year term of probation, six months of which were required to be served in home confinement. The government appeals the sentence, arguing that the Court erred by using the fraud provision of the Sentencing Guidelines, rather than the money-laundering provision, to determine the offense level for sentencing. The government also argues that the Court erred in awarding a one-level departure for Ms. Woods's charitable activity. We affirm.

## I.

The events that led to Ms. Woods's conviction began in 1996, when she filed for bankruptcy. Ms. Woods was required to list all of her assets and to turn over certain of them for liquidation. Among these, she identified to the Bankruptcy Court and turned over to the Trustee 200 shares of Wal-Mart stock and 100 shares of Food Lion stock. In fact, Ms. Woods owned 800 shares of Wal-Mart stock and 500 shares of Food Lion stock. She sold the other 600 shares of Wal-Mart stock for $16,045, and, without reporting the transaction to the Bankruptcy Trustee, deposited the proceeds, in the form of a check, into her husband's bank account. The next day, Ms. Woods and her husband obtained four $2,500 cashier's checks from the account, and used the money to pay personal expenses and to repay a loan from a relative. When confronted by the Trustee about the Wal-Mart stock, Ms. Woods admitted the diversion, but claimed that she had disclosed all of her other assets. According to the government, however, Ms. Woods had also sold the other 400 unreported shares of Food Lion stock for $3,274.25, and had used that money to pay personal expenses. The diversion of the Food Lion stock was not discovered until the matter had been referred to the United States Attorney by the Trustee.

In 1997, the United States filed a two-count indictment against Ms. Woods, alleging that she committed: 1) bankruptcy fraud, under 18 U.S.C. § 152, when she knowingly and fraudulently concealed the Wal-Mart stock from the Bankruptcy Trustee; and 2) money laundering, under 18 U.S.C. § 1957, when she knowingly

-2-

deposited the check representing the proceeds of the sale of this stock into her husband's bank account.

Ms. Woods agreed to plead guilty. The plea agreement contained a stipulation that the offense level under the Sentencing Guidelines was 13 for the bankruptcy fraud count and 19 for the money-laundering count, before any reduction for acceptance of responsibility. The agreement also stated that "[t]he parties further agree that the sentence ultimately imposed is within the sole discretion of the Court." Appellant's Add. at 11. Before sentencing, Ms. Woods moved for departure from the money-laundering guideline, U.S.S.G. § 2S1.2, arguing that the case presented factors that took it outside the "heartland" of money-laundering cases, and that the appropriate level for sentencing should take into account § 2F1.1, the guideline for the underlying offense, bankruptcy fraud. Specifically, Ms. Woods argued that the main purpose of the money-laundering statutes was to combat drug trafficking and organized crime, that the money-laundering guidelines were designed to be used principally in that context, and that her deposit of proceeds from the sale of the Wal-Mart stock was not typical of the conduct the Sentencing Commission intended to punish under § 2S1.2. The District Court agreed, finding that "[t]he statute on money laundering was not intended to be imposed in this type of case," and that "the offense committed in this case is outside the heartland of cases." Appellant's Add. at 6. Ms. Woods also argued that her extensive charitable activity warranted an additional departure under § 5H1.11. Again, the Court agreed, and granted a one-level downward departure. Ms. Woods was sentenced to three years' probation.

## II.

In this appeal, the United States argues that the District Court erred in departing below the money-laundering guidelines because the activity engaged in by Ms. Woods (depositing the check into her husband's bank account and using the funds to purchase cashier's checks) falls within the range of conduct prohibited by 18 U.S.C. § 1957.

That statute, in pertinent part, provides that: "Whoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished . . .." 18 U.S.C. § 1957(a). The term "specified unlawful activity" encompasses a wide range of criminal conduct, including bankruptcy fraud. See 18 U.S.C. § 1956(c)(7)(D). Ms. Woods does not argue that her conduct did not violate the money-laundering statute. It clearly did. Her argument is that the deposit of the check was not serious money laundering as contemplated by the Sentencing Commission when it promulgated the money-laundering guidelines.

Under Koon v. United States, 518 U.S. 81 (1996), a district court may depart from the Sentencing Guidelines if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." Id. at 92 (quoting 18 U.S.C. § 3553(b)). The Supreme Court noted that the Sentencing Commission "did not adequately take into account cases that are, for one reason or another, 'unusual,' " 518 U.S. at 93 (citing 1995 U.S.S.G. ch. 1, pt. A, intro. comment. 4(b)), and said that, under the Guidelines, departures may be considered in "atypical" cases.

Before departing from the Guidelines, a sentencing court first must determine whether a particular case presents features that "take it outside the Guidelines' 'heartland' and make of it a special, or unusual, case." Koon, 518 U.S. at 95. The court must then decide whether the Sentencing Commission has forbidden, encouraged, or discouraged departures based on those features. While a forbidden factor may not be used as a basis for departure, an encouraged factor may be considered if the Guidelines have not already taken it into account. A discouraged factor -- or an encouraged factor already taken into account -- may also be used as a basis for departure if the factor is present to an exceptional degree. If the factor is unmentioned, the sentencing court must consider the "structure and theory of both relevant individual

-4-

guidelines and the Guidelines taken as a whole," and decide whether the factor is sufficient to take the case out of the heartland. Id. at 96 (citing United States v. Rivera, 994 F.2d 942, 949 (1st Cir. 1993)). The Commission specifically said that it did "not intend to limit the kind of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case." U.S.S.G. ch. 1, pt. A, intro. comment. 4(b).

In Ms. Woods's case, the District Court found that, because the underlying offense was bankruptcy fraud, and not drug trafficking or some other offense typical of organized crime, the facts of her money laundering did not fall into the "heartland" of cases involving that offense. The Court thought the sentence for bankruptcy fraud would more appropriately reflect the severity of the money-laundering offense. We believe ample evidence exists in the record, in the case law, and in the legislative and administrative history of the money-laundering guidelines to support the District Court's downward departure. Under Koon, "[t]he appellate court should not review the departure decision de novo, but instead should ask whether the sentencing court abused its discretion." 518 U.S. at 91.

Significant support for Ms. Woods's position can be found in the work of the Sentencing Commission. In 1995, the Commission proposed amendments to the money-laundering guidelines. The Commission had conducted an extensive study of sentencing results under those guidelines, and found that "the broad and inconsistent use of money laundering charges, coupled with an inflexible, arbitrarily determined guideline structure, [had] result[ed] in substantial unwarranted disparity and disproportionality in the sentencing of money laundering conduct." Report to the Congress: Sentencing Policy for Money Laundering Offenses, including Comments on Department of Justice Report, United States Sentencing Comm'n (Sept. 18, 1997), p. 9. Notably, the Commission concluded that money-laundering sentences were "being imposed for a much broader scope of offense conduct, including some conduct that is substantially less serious than the conduct contemplated when the . . . guidelines were

first formulated." Id. at 5.  The proposed amendments to the guidelines would have tied the punishment for money laundering to the level of punishment for the underlying crime.  Under the new guidelines, according to the Commission, penalties would be "more proportionate to both the seriousness of the underlying criminal conduct from which the laundered funds were derived and to the nature and seriousness of the laundering conduct itself."  Id. at 2.

Congress, however, disapproved the amendments.  See Act of October 30, 1995, Pub. L. No. 104-38, § 1, 109 Stat. 334.  The report of the House Judiciary Committee recommending disapproval of the amendment said that the Sentencing Commission's changes "appear to respond in part to the class of money laundering cases in which the money laundering activity is not extensive, including 'receipt and deposit' cases -- those in which the money laundering conduct is limited to depositing the proceeds of unlawful activity in a financial institution account identifiable to the person who committed the underlying offense.  While the application of the current guidelines to receipt-and-deposit cases, as well as to certain other cases that do not involve aggravated money laundering activity, may be problematic . . . past sentencing anomalies arising from relatively few cases do not justify a sweeping downward adjustment in the money laundering guidelines."  H.R. Rep. No. 104-272, at 14-15, reprinted in 1995 U.S.C.C.A.N. 335, 348-49.  We believe these statements support Ms. Woods's contention that her case is outside the Guidelines' "heartland."  In addition, we find nothing in the report that suggests Congress, in disapproving the proposed amendments, also intended to prohibit sentencing courts from departing downward, where appropriate, in receipt-and-deposit cases or in those individual cases "that do not involve aggravated money laundering activity."

Congress, moreover, took another step:  it directed the Department of Justice to prepare a report on the prosecution of money-laundering offenses and to ensure that the statutes against money laundering were being prosecuted consistently and uniformly by the United States Attorneys' offices.  See Report for the Senate and House Judiciary

<u>Committees on the Charging and Plea Practices of Federal Prosecutors with Respect to the Offense of Money Laundering</u>, Dept. of Justice (June 17, 1996). The report prepared by the Department stated that the money-laundering statutes "should not be used in cases where the money laundering activity is minimal or incidental to the underlying crime. . . . The money laundering statutes should be used only where they reflect the nature and extent of the criminal conduct involved . . .." <u>Id</u>. at 14. The procedures implemented to ensure consistent and uniform prosecutions among jurisdictions involve various approval, consultation, and notification requirements. <u>Id</u>. at 12-16. In addition, the <u>United States Attorney's Manual</u> provides that "only particularly complex and sensitive cases should be prosecuted" under the money-laundering statutes. <u>United States v. Bart</u>, 973 F. Supp. 691, 697 (W.D. Tex. 1997) (citing U.S. Dept. of Justice, <u>United States Attorney's Manual</u>, Section 9-3.400.)

Congress also directed the Sentencing Commission to respond to the Department of Justice's report. See <u>Report to the Congress: Sentencing Policy for Money Laundering Offenses, including Comments on Department of Justice Report</u>, United States Sentencing Comm'n (Sept. 18, 1997). In this report, the Commission noted that the current sentencing structure for money-laundering offenses had been promulgated less than six months after the two primary money-laundering statutes had become effective, and that "no actual prosecutorial experience or judicial guidance existed to inform the Commission's formulation of the initial money laundering guidelines." <u>Id</u>. at 3. The Commission wrote that it set the "relatively high" base offense levels "to penalize the conduct about which Congress seemed most concerned when it enacted the money laundering statutes, namely: 1) situations in which the 'laundered' funds derived from serious underlying criminal conduct such as a significant drug trafficking operation or organized crime; and 2) situations in which the financial transaction was separate from the underlying crime and was undertaken to either: a) make it appear that the funds were legitimate, or b) promote additional criminal conduct by reinvesting the proceeds in additional criminal conduct." <u>Id</u>. at 4. The Commission reviewed the steps taken by the Department of Justice to ensure that money-laundering offenses were

being prosecuted uniformly, but concluded that the Department's efforts, without a "properly restructured money laundering guideline," were not adequate to avoid "unwarranted sentencing disparity." Id. at 13.

The government cites United States v. Morris, 18 F.3d 562 (8th Cir. 1994), where a panel of this Court reversed the District Court for departing downward from the money-laundering guidelines. In Morris, the financial transaction was intended to promote the carrying on of a complex bank fraud scheme involving an officer of a financial institution. We believe Ms. Woods's case is distinguishable, because her deposit of the check had the effect of concluding, rather than promoting, the bankruptcy fraud.

The government also cites United States v. O'Kane, 1998 WL 568813 (8th Cir. 1998). In O'Kane, this Court, in reversing a sentence arrived at after the District Court grouped mail-fraud and money-laundering counts together, held that the offenses invaded different interests and were "not so closely related as to justify grouping . . .." 1998 WL 568813 at * 3. O'Kane is not a departure case, however. And while we agree that bankruptcy fraud and money laundering invade different interests, we do not read O'Kane to prohibit a District Court from departing from the Guidelines when it determines that a case is outside the "heartland."

In summary, we do not believe the deposit of the check by Ms. Woods into her husband's account, or their obtaining of the cashier's checks, constitutes serious money-laundering conduct as contemplated by the Sentencing Commission for punishment under the money-laundering guidelines. At least the District Court could have so found within its discretion. This is not the sort of conduct one normally thinks of as money laundering. Accordingly, we hold that the District Court did not abuse its discretion when it found that Ms. Woods's case fell outside the "heartland" and granted her motion for a downward departure.

III.

The government also appeals the one-level downward departure granted by the District Court for Ms. Woods's charitable activity. The Sentencing Guidelines provide that a defendant's charitable conduct is not an appropriate basis for a downward departure unless it is exceptional. See Koon, 518 U.S. at 95-96. Ms. Woods brought into her own home two troubled young women, one of whom was a former employee who had stolen from Ms. Woods. The other was the defendant's niece, who had had difficulty living at home, and who had dropped out of school. Ms. Woods paid for them to attend a private high school, both were graduated, and they are now productive members of society. Ms. Woods also helped an elderly friend, who was unhappy living in a nursing home, move into an apartment near her home. She helped to care for him, and he was able to live out his remaining years with greater independence. The District Court thought these efforts by Ms. Woods were exceptional, and we have no basis for holding that they were not.

VI.

For the reasons given above, the judgment of the District Court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-9-