# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-4100

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | Appeals from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Arthur Schuyler Ross, | * | |
| | * | |
| Defendant-Appellant. | * | |

_____

No. 98-4106

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Arthur Schuyler Ross, also known as | * | |
| John Ross, | * | |
| | * | |
| Defendant-Appellee. | * | |

_____

Submitted: October 22, 1999

Filed: April 21, 2000

_____

Before McMILLIAN, LAY, and FAGG, Circuit Judges.
_____

LAY, Circuit Judge.

Following a jury trial in federal district court, Arthur S. Ross was found guilty of fifteen counts of wire fraud and eighteen counts of money laundering. The court ordered restitution of $2.7 million and imposed a fifteen month prison sentence on the wire fraud counts and an eighty-seven month sentence for money laundering, with both sentences to be served concurrently. Ross appeals his conviction; on cross-appeal, the Government challenges the court's downward departures at sentencing and its failure to impose a four-level enhancement for Ross' aggravating role in the offenses. We affirm the convictions but reverse and remand for resentencing.

## I. Background

In early 1994, Ross formed Consortium International, Inc. (Consortium), a Bloomington, Minnesota, corporation that purported to finance business transactions. Initially, Ross was the President of Consortium, then later assumed the position of Chairman of the Board of Directors.

The scheme charged in the indictment alleged that Consortium would provide its "Standard Information Package" describing available services to any interested person or organization, and containing a list of closed and funded transactions exceeding $165 million in which Consortium's principals had acted as "principals, investors, lenders, investment/merchant bankers, syndicators and/or advisors." Persons interested in Consortium's services would then submit an executive summary describing the business to be financed, its current assets, cash flow projections, and personal financial statements of all principals. If Consortium found the executive summary feasible, Consortium would invite the person to present a project proposal to its officers in Minnesota. Thereafter, the borrower paid Consortium a $10,000 expense

retainer and the parties entered into "preliminary commitment agreements" (PCA) which expressly disclaimed any guarantee of funding. Consortium billed its costs of evaluating the proposed project against the $10,000 retainer with the promise that any unexpended monies would be returned to the payer if the project failed to proceed to funding.

If all parties agreed to proceed beyond the evaluation phase, a "formal commitment agreement" (FCA) was prepared and the potential borrower was required to pay Consortium a non-refundable fee of one percent of the loan amount, half of which was due at FCA execution. Unlike its predecessor agreement, the twenty-plus page formal commitment agreement did not contain a disclaimer of funding, but instead "approved" the loan amount subject to a number of conditions precedent, the most notable of which was that no loan would be approved without final ratification by Consortium's Board of Directors.[1]

Between Consortium's inception in early 1994 and Ross' arrest on August 27, 1996, Ross admits that nearly two hundred PCAs were executed, only thirty-four of which proceeded to FCA execution. From these transactions, Consortium collected in excess of $3.3 million. Throughout its course of business, Consortium never fully funded a loan.

The Government contended Consortium was operating an illegal "advance fee" scheme through which it fraudulently obtained fees from individuals and businesses

---

[1]Consortium's Board of Directors consisted of Ross, Andrew Druck (Druck) (Consortium's President), Gregory Adelman (Adelman) (its Vice President) and, at some point, Mary Cummins. Ross had authority by proxy to vote on Cummins' behalf.

Both Druck and Adelman entered into plea agreements with the Government in exchange for testimony against Ross. Druck pleaded guilty to wire fraud and Adelman pleaded guilty to filing a false tax return.

seeking financing with neither the intent nor the ability to do so. Following a pretrial status conference, the court granted the Government's motion to dismiss two counts. Over Ross' objection, the court also granted in part the Government's motion to amend the indictment.

Ross proceeded pro se at a twenty-two day jury trial in federal district court which began on October 1, 1997, and was convicted on all thirty-three counts.[2] On November 24, 1997, the jury returned a special forfeiture verdict finding that properties in the amount of $88,216.86 were traceable to the money laundering violations and were therefore subject to forfeiture. At sentencing on November 12, 1998, the court found the amount of loss in the instant case to be $3.2 million and ordered restitution in excess of $2.7 million. The court also imposed a prison sentence of fifteen months for the wire fraud convictions and eighty-seven months for money laundering, with the sentences to be served concurrently.

On appeal, Ross argues that his convictions should be set aside for various reasons: (1) his actions did not involve the "proceeds" of unlawful activity under 18 U.S.C. § 1956(a)(1); (2) the court erred in denying funding as to one of Ross' two requested expert witnesses; (3) the amendment of the indictment deprived him of his right to indictment by grand jury; and (4) the district court erred in awarding victim restitution to those 173 persons who executed PCAs but never proceeded to FCA execution.

---

[2]The evidence against Ross comprised of volumes of documents. Lacking personal funds, Ross petitioned the court under the Criminal Justice Act, 18 U.S.C. § 3006A(e), for funding for two expert witnesses. The court only certified one expert as necessary to an adequate defense, finding that the testimony of both would be duplicative.

The Government cross-appeals arguing that the district court abused its discretion under the United States Sentencing Guidelines Manual (Guidelines) by departing downward from the sentencing range on both the money laundering and wire fraud convictions and erred in failing to impose a four-level enhancement for Ross' aggravating leadership role in the scheme.

## II. Discussion

A.    Sufficiency of the Evidence

Ross first challenges the sufficiency of the evidence for the money laundering conviction, arguing that the financial transactions charged did not involve the "proceeds" of an unlawful activity under the money laundering counts.[3]

---

[3]Section 1956 identifies the crime of money laundering as follows:

(a)(1)  Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity–

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

. . .

(B) knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . .

18 U.S.C. § 1956(a)(1) (emphasis added).

The gravamen of Ross' argument is that the money laundering convictions must be reversed because the Government did not prove an essential element of the crime; namely, that the funds deposited into Consortium's business account were "proceeds" of some previously completed illegal activity. Instead, he argues that the indictment merely charged the receipt and deposit of proceeds and contends that the mere deposit of money received from the underlying wire fraud does not evidence his use of proceeds to "promote" the "carrying on" of illegal activity under § 1956(a)(1)(A)(i).

The cases relied upon by Ross are readily distinguishable from this case to the extent they are factually inapposite from the instant case. These cases, such as United States v. Shoff, 151 F.3d 889 (8th Cir. 1998) (the money laundering statute may not be so broadly construed that it becomes a money spending statute) are based on violations of the Money Laundering Control Act of 1986 not charged in Ross' indictment and turn on the fact that the allegations of money laundering are based on the same transaction charged in the predicate act thereby raising double jeopardy concerns. See generally, United States v. Johnson, 971 F.2d 562 (10th Cir. 1992) (§ 1957 money laundering charge predicated on wire fraud transfers to defendants account where wire fraud counts charged the same wire transfers); United States v. Christo, 129 F.3d 578 (11th Cir. 1997) (reversing conviction for money laundering where the money laundering counts were based on the same transmission of funds as the underlying criminal activity of bank fraud and misapplication of bank funds).

We rejected an argument substantially similar to Ross' in United States v. Hildebrand, 152 F.3d 756 (8th Cir. 1998). The defendants in Hildebrand were involved in a conspiracy through which they collected a $300 fee from persons for the purpose of filing a claim on their behalf in a pro se class action suit. The co-conspirators represented that for their participation, claimants could share in a substantial damage award. Throughout the course of the conspiracy, the group collected over $1.3 million. Id. at 761. Like Ross, the defendants were indicted under 18 U.S.C. § 1956(a)(1)(A) and (a)(1)(B) for participating in a conspiracy to launder money. Following conviction,

three defendants appealed arguing the Government failed to prove the elements of the crime. Id. at 762. We affirmed the convictions based on the evidence that the defendants deposited over $1.1 million in mail fraud proceeds into bank accounts and then expended the proceeds to promote the ongoing scheme to defraud by paying for office supplies, secretarial services, and staff wages. Id. See also United States v. Kennedy, 64 F.3d 1465, 1477-78 (10th Cir. 1995) (affirming § 1956 conviction for money laundering predicated on acts of mail fraud separate and distinct from acts charged as money laundering); Johnson, 971 F.2d at 566 (finding jury could conclude defendant promoted fraudulent scheme in violation of § 1956 where evidence showed he used illegal proceeds to purchase Mercedes to impress investors and paid off mortgage on residence from which he operated fraudulent scheme).

Ross' wire fraud convictions were predicated on facsimile transmissions of various documents to potential borrowers (e.g., FCAs, letters promising to fund loans, and a letter terminating a loan agreement). The money laundering convictions arose from related, but separate and distinct transactions, namely the deposit of wire fraud proceeds and subsequent acts promoting the carrying on of illegal activity.

At trial, the Government presented proof that Consortium was engaged in a broad scheme to defraud and that Consortium's continuing operation was funded almost exclusively by fees received from potential borrowers due to fraudulent means. The evidence showed these funds were deposited into Consortium's business account and thereafter checks were written on the business account to partially fund another loan, fund employee travel to Luxembourg in order to establish bank accounts abroad to conceal assets from the United States, and to pay Consortium's rent and overhead to maintain its appearance of validity throughout the scheme. Further, trial testimony indicated that the salaries of Druck and Adelman were artificially inflated in order to

allow each to pay Ross $1,000 cash every two weeks in lieu of Ross receiving traceable compensation from Consortium.[4]

From this evidence, a jury could reasonably find that the deposited funds were the proceeds of wire fraud and that Ross thereafter used the deposited proceeds to sustain and promote the illegal scheme in violation of § 1956(a)(1). Because we find ample evidence in the record to support the jury's verdict, we affirm the money laundering convictions.

B.    Expert Witness Funding

Ross argues that the trial court's denial of funding for an expert witness to testify regarding venture capital industry practice violated the Criminal Justice Act, 18 U.S.C. § 3006A(e) and his Fifth Amendment right of due process. We disagree.

The Criminal Justice Act Revision of 1986 permits a "financially unable" defendant to request funding for "investigative, expert, or other services necessary for adequate representation . . . ." 18 U.S.C. § 3006A(e). In analyzing this claim, we consider whether Ross demonstrated a reasonable probability that the requested expert would aid in his defense and that denial of funding would result in an unfair trial. See Little v. Armontrout, 835 F.2d 1240, 1244 (8th Cir. 1987) (en banc), cert. denied, 487 U.S. 1210 (1988). At the time of his request, Ross must do more than allege the services would be helpful, rather he must show they are "necessary" to afford him "'an adequate opportunity to present [his] claims fairly within the adversary system.'" Ake v. Oklahoma, 470 U.S. 68, 77, 80 (1985) (quoting Ross v. Moffitt, 417 U.S. 600, 612 (1974)). The decision of whether to fund an expert rests in the sound discretion of the

---

[4]Testimony suggests Ross established this procedure in order to avoid personal income which would have been garnished by the Internal Revenue Service to satisfy a tax lien.

trial court and we will not reverse absent an abuse of discretion. See United States v. Casal, 915 F.2d 1225, 1230 (8th Cir.1990).

Ross applied for court approval to hire two accountants as expert witnesses: (1) Henry Langer (Langer), a certified fraud examiner and retired Internal Revenue Service agent, at a cost of $8,350; and (2) Richard Rosenbaum (Rosenbaum), a certified public accountant with venture capital experience, at a cost of $19,300. Following an ex parte hearing, the magistrate judge found that the services of both experts would be cumulative and unnecessary. Based on this finding, the court certified the funding of Langer's services and denied funding as to Rosenbaum.

Ross argues that the denial of expert witness funding for Rosenbaum deprived him of a fair opportunity to defend himself. Specifically, he argues that Langer could do no more than follow the paper trail of money and loan agreements, but that testimony from Rosenbaum would have supported his position that his business practices were both lawful and consistent with industry practice.

In the application for expert services as to Langer, Ross stated Langer's testimony would show that "the allegations of the Government with respect to the Defendant's involvement with money matters set forth in the indictment are incorrect and that the defendant acted lawfully . . . ." Ross indicated that Rosenbaum would "testify as to the appropriateness of acts by the Defendant to rebut the Government's allegations of fraud and money laundering" and could summarize the "overall business dealings" of Consortium with third parties.

Based on Ross' characterization of the nature of the testimony of each witness and our review of the record, we agree with the district court that the purported testimony of the two expert witnesses, both schooled in accounting and testifying as to the legality of Ross' behavior, would be cumulative and unnecessary to his defense. Further, we agree that Ross failed to demonstrate a reasonable probability that

Rosenbaum's services would aid his defense and that denial would result in an unfair trial. Thus, we find no abuse of discretion in the court's decision and cannot say that denial of Rosenbaum's services rendered the trial fundamentally unfair.

C.    Amendment of the Indictment

As a general rule, an indictment may not be amended. See United States v. Burnett, 582 F.2d 436, 438 (8th Cir. 1976) (citing Ex parte Bain, 121 U.S. 1 (1887)). The court may, however, amend an indictment by striking language that is "'merely a matter of form,'" id. (quoting Russell v. United States, 369 U.S. 749, 770 (1962)), or where the language omitted is surplusage and nothing is thereby added to the indictment and the remaining allegations state the elements of an offense. Id. (citing Salinger v. United States, 272 U.S. 542, 548-549 (1926)).

In relevant part, the general allegations in the original indictment stated:

> JOHN ROSS, purportedly acting on behalf of Consortium International, Inc., and aided and abetted by others, devised and executed an "advance fee" scheme by which he fraudulently obtained approximately $3,500,000 in "fees" collected from individuals and businesses seeking financing.

(DEN 1 at 1).

On motion of the Government, the indictment was subsequently amended by deleting the underscored words and eliminating two counts of money laundering. Ross contends this changed a substantive element of a violation under 18 U.S.C. § 1343[5] and

---

[5]The crime of wire fraud is committed by a person who:

having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent

impermissibly broadened the scope of the indictment. Ross' argument is premised on the belief that the deleted $3.5 million dollar figure is the only language in the original indictment that alleged that the preliminary commitment agreements were a part of the scheme to defraud. Importantly, Ross concedes that if the acts pertaining to the preliminary commitment agreements were not necessary to the allegations of an advance fee scheme, then deletion of the $3.5 million figure was mere surplusage under United States v. Miller, 471 U.S. 130 (1985).

The Court in Miller considered whether a defendant's right to indictment by grand jury under the Fifth Amendment is violated when he is tried under an indictment alleging a broad scheme to defraud and is convicted on trial proof that is significantly more narrow and limited, yet included in the more broad fraudulent scheme delineated in the indictment. 471 U.S. at 131.

Initially, the Court observed that the facts at trial conformed to one of the two theories in the indictment, thus giving Miller "clear notice" of the allegations against him. Id. at 134. Then, it held that the right to indictment by grand jury is normally not violated where the indictment alleges other means of committing the crime, so long as the crime and elements sustaining conviction are clearly and fully set forth in the indictment. Id. at 136.[6]

---

pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice . . . .

18 U.S.C. § 1343.

[6]The Miller Court expressly overruled that portion of Ex parte Bain, 121 U.S. 1 (1887) on which Ross relies, writing: "To the extent Bain stands for the proposition that it constitutes an unconstitutional amendment to drop from an indictment those allegations that are unnecessary to an offense that is clearly contained within it, that

The <u>Miller</u> Court found no violation of a right to indictment by grand jury. <u>Id.</u> at 135. In doing so, it observed:

> Convictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment. A part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as "a useless averment" that "may be ignored."

<u>Id.</u> at 136 (quoting <u>Ford v. United States</u>, 273 U.S. 593, 602 (1927)).

Contrary to Ross' assertion, the $3.5 million figure is not the only indication in the original indictment that acts pertaining to preliminary commitment agreements were a part of the alleged scheme to defraud.[7] It is clear, therefore, that the altered indictment gave Ross notice of the charges against him. Further, elimination of the $3.5 million figure did not remove or add an element to the charges against him because the charged wire fraud neither requires proof of a precise dollar amount nor requires the scheme be successful or complete or result in actual harm or injury to the

---

case has simply not survived." <u>United States v. Miller</u>, 471 U.S. 130, 144 (1985).

[7]The original and altered indictment alleged that the scheme was accomplished by having a victim sign a preliminary commitment agreement and pay a $10,000 expense retainer against which Consortium would charge expenses associated with its proposal evaluation. Both the original and amended indictments also alleged that, as part of the scheme, Ross never intended to obtain and could not obtain funding at the time he induced the borrowers to pay the expense retainer and the formal commitment fees.

victim.[8]  See United States v. Jain, 93 F.3d 436, 441 (8th Cir. 1996) (Government must merely show "that some actual harm or injury was *contemplated* by the schemer.").

We find, therefore, that the court's elimination of the dollar value of the scheme to defraud was merely, as Ross conceded, an innocuous alteration to remove "surplusage" and did not violate Ross' right to indictment by a grand jury.  This is particularly true given the fact that the indictment clearly set forth the scope of the scheme to defraud.  We also find that Ross failed to show that the elimination of the language at issue prejudiced his defense as it did not add to the general allegations in the original indictment and neither eliminated an essential element of the crime of wire fraud nor resulted in any surprise at trial.  See U.S. v. Krall, 835 F.2d 711, 715 (8th Cir. 1987).

D.     Victim Restitution

The district court ordered victim restitution in excess of $2.7 million.  This amount is comprised of the various fees (including expense retainer fees associated with preliminary commitment agreements) paid to Consortium by persons seeking financing.  On appeal, Ross argues that the court erred in ordering restitution to persons who are not "victims" as defined in the Mandatory Victims Restitution Act, 18 U.S.C. § 3663, et seq., (MVRA).  We first note that the district court has wide discretion in ordering restitution.  See United States v. Manzer, 69 F.3d 222, 229 (8th Cir. 1995).  Reviewing the restitution order for abuse of discretion and the court's application of the statute de novo, see United States v. Lively, 20 F.3d 193, 200 (6th Cir. 1994), we affirm the ruling of the district court.

_____

[8]The essential elements of wire fraud are: (1) a scheme to defraud, (2) use of interstate wires incident to the scheme, and (3) intent to cause harm.  See United States v. Ramirez, 196 F.3d 895, 897 (8th Cir. 1999) (citing United States v. Lefkowitz, 125 F.3d 608, 614 (8th Cir.1997)).

Under the MVRA, the court shall order a defendant guilty of "an offense against property under this title, including any offense committed by fraud or deceit" to pay restitution to victims. 18 U.S.C. § 3663A(c)(1)(A)(ii). The Act defines "victim" as

> a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2).

Ross argues that only the thirty-four persons who executed formal commitment agreements (as opposed to the remainder who only executed preliminary commitment agreements) are "victims" entitled to restitution because the language of the preliminary commitment agreements expressly stated that Consortium made no guarantees, warranties, or promises regarding the likelihood that a loan would be funded and that the $10,000 expense retainers were legitimately earned by Consortium.

Our precedent makes clear that victim restitution may be ordered for criminal conduct that is part of a broad scheme to defraud, without regard to whether the defendant is convicted for each fraudulent act in the scheme. See Manzer, 69 F.3d at 229-30 (affirming victim restitution of $2.7 million based on defendant's unlawful sale of 270 satellite descrambling discs, despite conviction on only two counts of mail fraud, two counts of wire fraud, and one count of copyright infringement). In this case, the jury convicted Ross of fifteen counts of wire fraud and eighteen counts of money laundering under an indictment that alleged a broad scheme to defraud. The court was presented evidence that 173 persons lost $3.5 million throughout the course of the scheme to defraud. The $3.5 million merely reflects the fees collected by Consortium and does not include expenditures made by would-be borrowers in reliance on the promise of funding, which trial testimony suggests far exceeds the challenged

restitution ordered. Based on the evidence presented, there is little doubt that each of the persons who executed preliminary commitment agreements, paid expense retainers of $10,000, and were thereafter rejected for a loan by Consortium, were directly and proximately harmed by the scheme to defraud and fall well within the ambit of Congress' definition of "victim" under the MVRA. Ross' argument to the contrary is without merit.

E.    Government's Cross-Appeal

On cross-appeal, the Government contends the district court erred in failing to enhance Ross' offense level for his role as a leader or organizer in the scheme and abused its discretion in departing downward on Ross' sentences for money laundering.[9]

The Supreme Court directs that appellate courts apply a "unitary abuse-of-discretion standard" when reviewing sentencing departures. Koon v. United States, 518 U.S. 81, 99-100 (1996); see also United States v. Woods, 159 F.3d 1132, 1135 (8th Cir. 1998) (Under Koon, appellate court should not review departure decision de novo.). For reasons explained below, we reverse and remand for resentencing.

1.    Aggravating Role Enhancement

---

[9]The Government also argued that the district court abused its discretion when it imposed a 15-month sentence on the wire fraud counts without offering a basis for its departure despite a Guideline range of 46-57 months. Without deciding whether the Government preserved the question for appeal, we do not reach this issue based on the Government's acknowledgment at oral argument that affirmance of the money laundering convictions would render moot the appeal of the downward departure on the concurrent wire fraud sentence.

The Government argues the court made a mistake of law in failing to impose a four-level enhancement under U.S.S.G. § 3B1.1(a) for Ross' leadership role in the offense.[10] Absent a mistake of law, the district court's factual findings regarding Ross' role in the offense will be reversed only if clearly erroneous. See United States v. Willis, 997 F.2d 407, 419 (8th Cir. 1993). We give due deference to the sentencing court's application of the Guidelines to the facts, see United States v. Gomez, 165 F.3d 650, 654 (8th Cir. 1999), and will reverse only if we are left with a "definite and firm conviction that a mistake has been made." United States v. Harry, 960 F.2d 51, 53 (8th Cir. 1992).

In order to impose a two-level enhancement for role in the offense under § 3B1.1(c), the court must first determine that neither § 3B1.1(a) nor § 3B1.1(b) apply. See U.S.S.G. § 3B1.1(c) (1998) (two-level enhancement applies where defendant was leader, organizer, manager or supervisor in criminal activity other than that described in (a) or (b)).

---

[10]The Guidelines provide for an increase in the offense level based on a defendant's aggravating role in the offense as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.

(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2** levels.

U.S.S.G. § 3B1.1 (1998).

Before sentencing, Ross objected to the four-level enhancement recommended in the presentence investigation report for his aggravating role in the offense. Specifically, he argued that even if the court found he was a leader or organizer of criminal activity, the evidence presented at trial did not prove that the activity either "involved five or more participants" or was "otherwise extensive."  U.S.S.G. § 3B1.1(a) (1998).  Asserting the absence of such evidence, Ross urged the court to find no enhancement was warranted or to impose, at most, a two-level enhancement under U.S.S.G. § 3B1.1(c).  On appeal, the Government contends the court erred in failing to impose the four-level enhancement as recommended by the probation officer.

In imposing the two-level enhancement, the court stated:

> The issue of the defendant's role in the offense, the Court has examined this issue carefully.  The probation officer has recommended a four-level increase for Mr. Ross's role in the offense.  Having examined that carefully, I am going to partially grant the objection that [defendant's counsel] has made and give a role increase, a two-level increase for role in the offense, and not a four-level increase.
>
> I do believe that this was an establishment that Mr. Ross played a primary role and an organizer role, but I do not believe that he alone was responsible for what went on in Consortium.  So therefore, I will grant the objection to the extent that I will not give a four-level increase.

(Sent. Tr. at 45).

The court's statement leaves no doubt that it found Ross was an organizer or leader of criminal activity.  Indeed, there is ample record evidence to support such a finding given the trial testimony that Ross controlled virtually every aspect of Consortium's operation.  Less clear, however, is the court's finding, if any, regarding the number of participants involved or the extensiveness of the criminal activity.  The court's comments evidence a finding that other persons were also responsible for

-17-

Consortium's misdeeds, which is supported by the record; however, such a finding sheds no light on the point we must address which is whether the court found the criminal activity involved five or more participants or was otherwise extensive. We believe the district court is best suited to make such a finding and did not do so in the instant case. Because the sentencing record does not clearly indicate the requisite finding, we reverse and remand for resentencing to permit the court to make the necessary finding.

2.      Downward Departure on Money Laundering

In response to Ross' motion, the district court made a three-level downward departure under U.S.S.G. § 5K2.0 (the general grounds for departure) concluding that the case fell outside the guideline "heartland" for money laundering. On cross-appeal, the Government argues that the district court abused its discretion in so departing when it (1) relied on an impermissible factor for downward departure, namely, the court's finding that not all of the $3.2 million wire fraud proceeds were put to fraudulent use; and (2) determined that Ross' conduct fell outside the guideline "heartland"[11] for money laundering.

---

[11]The Guidelines state:

> The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

U.S.S.G. ch. 1, pt. A., intro. comment 4(b) (1998).

The Supreme Court instructs that if a case is an "ordinary" one, the district court must impose a sentence within the applicable Guideline range. Koon, 518 U.S. at 92. If however, the case is an "unusual" or "atypical" one, the sentencing court may

> depart from the applicable Guideline range if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."

Id. (quoting 18 U.S.C. § 3553(b)). Thus, the Guidelines require a district court to determine whether the case at bar presents "aggravating or mitigating circumstances of a kind or degree not adequately taken into consideration" by the Commission when formulating the Guidelines. Id. at 94.

A fair reading of the sentencing transcript indicates the court departed downward for two reasons. First, because it found not all the advance fees were put to a fraudulent use, and second, due to the "unfortunate" variation between the Guidelines' treatment of basic fraud and money laundering.[12] These two factors, the court

_____

[12]At sentencing, the district court articulated the following basis for its downward departure:

> The Court finds that although it is very difficult to determine, even after having sat through the trial in this matter, exactly how much of the advanced fees were actually put to a fraudulent use, the Court finds that not all of the advanced fees was [sic] put to a fraudulent use in this case. That is a factor to be considered.
>
> The money laundering charges in this case, the convictions on money laundering, do vary greatly. And that's unfortunate from the guidelines that are applicable for the basic fraud charges. And I think that is perhaps an additional rationale that supports a downward departure

-19-

reasoned, supported a conclusion that the case presented characteristics taking it outside the heartland money laundering guideline.

We find that the district court abused its discretion in departing from the guideline money laundering sentence by departing, at least in part, due to what it viewed as an "unfortunate" disparity between and the "particular problem" with the Guidelines' treatment of wire fraud and of money laundering, concluding that "the original guidelines amount  is – or level, is outside of the heartland of the cases considered by the Sentencing Commission."   The Guidelines make clear that "dissatisfaction with the available sentencing range or a preference for a different sentence than that authorized by the guidelines is not an appropriate basis for a sentence outside the applicable guideline range." U.S.S.G. § 5K2.0, comment. (1998); see also, United States v. Wong, 127 F.3d 725, 727 (8th Cir. 1997) (reversing court's

---

under Section 5K2.0.

But specifically, the Court is finding that not all of the advanced fees were put to a fraudulent use.  That takes the case out of the guideline heartland.  It makes it an unusual case, unusual circumstances that warrant a downward departure.

Now, having said that, I'm going to depart downward by three levels, so that the guideline range that I'm applying is a guideline range for level 29, and that is 87 through 108 months.

The Court finds that the particular problem between the guideline's treatment of money laundering convictions and the guideline's treatment of fraud convictions, as they are applied in this particular case, to this particular set of facts, warrants a conclusion that the original guidelines amount is — or level, is outside of the heartland of the cases considered by the Sentencing Commission.

(Sent. Tr. 48-49).

downward departure due to court's disagreement with Guideline range applicable to defendants).

The Guidelines fix the base offense level at 23 for Ross' violation of § 1956(a)(1), a full three levels higher than convictions for other money laundering violations that do not involve the reinvesting of illegal proceeds to further criminal activity. See U.S.S.G. § 2S1.1(a) (1998) (base offense level of 23 for § 1956(a)(1) violations as compared to base offense level of 20 for other money laundering violations). This variance reflects Congress' intent that money laundering crimes which promote further illegal activity should be punished more severely than those that do not. See Hildebrand, 152 F.3d at 763 (Guidelines punish more severely the form of money laundering that involves reinvesting of proceeds to further illegal activity). Based on our case law, the plain language of the Guidelines, and the court's statements at sentencing, we find the court abused its discretion in departing due to its disagreement with the disparity between a money laundering sentence under § 2S1.1 and one for wire fraud under § 2F1.1.

Additionally, we question the court's departure based on its finding that not all of the $3.2 million proceeds were put to fraudulent use. As stated in Koon, a district court may depart if the court finds that there exists an "aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration" by the Commission. 518 U.S. at 93 (emphasis added). A violation of 18 U.S.C. § 1956(a)(1) is predicated on the commission of "specified unlawful activity" which expressly includes a financial transaction involving fraud or any scheme to defraud. See 18 U.S.C. § 1956(a)(1), (c)(7). The Commission, in consideration of the increased harm resulting from money laundering activity that promotes or furthers illegal activity, established a guideline that imposed a higher base offense level for § 1956(a)(1) violations than for other money laundering violations. Compare U.S.S.G. § 2S1.1(a)(1) with U.S.S.G. § 2S1.1(a)(2) (1998). Additionally, the Commission has taken into consideration the factor of the amount of funds laundered by including in the guideline

-21-

specific offense characteristics that impose increasingly higher sentences for crimes involving correspondingly increasing amounts of proceeds.  See U.S.S.G. § 2S1.1 (1998) (e.g., no increase if less than $100,000 laundered; six-level increase if funds laundered exceed $2 million but less than $3.5 million).  Where, as here, the Commission has taken a factor into consideration, a sentencing court may use the considered factor as a basis for departure only if it "determines that, in light of unusual circumstances, the weight attached to that factor under the guidelines is inadequate or excessive."  U.S.S.G. § 5K2.0, p.s. at p. 357 (1998).

In urging affirmance on this point, Ross suggests that his case is closely aligned with United States v. Woods, 159 F.3d 1132 (8th Cir. 1998).  In Woods, we affirmed a court's determination that the case fell outside the "heartland" money laundering guideline.  The defendant in Woods pleaded guilty to one count of bankruptcy fraud under 18 U.S.C. § 152 and one count of money laundering in violation of 18 U.S.C. § 1957 for failing to disclose to a bankruptcy trustee certain stock assets valued at less than $20,000.  159 F.3d at 1133.  After filing for bankruptcy, Woods liquidated her stocks and deposited the proceeds into her husband's bank account and thereafter used the money to pay personal expenses.  Id.

We do not read Woods as support for the district court's departure and note the significant factual dissimilarity between Woods and the present case.  Woods involved concealment of assets in a bankruptcy action and subsequent liquidation and deposit of approximately $20,000 in proceeds.  Ross' conviction, however, was based on his actions as the leader of an international scheme to defraud that transpired over two years and fraudulently induced over two hundred people to pay in excess of $3.2 million in fees in a futile effort to obtain a loan, the proceeds of which were used to maintain Consortium's operation.

We believe that the evidence was sufficient to support the jury's determination that the illegal proceeds of wire fraud were thereafter used to promote the carrying on

of the illegal scheme as alleged in the money laundering counts of the indictment. The proceeds generated from the underlying wire fraud were, in large part, the income stream that allowed Consortium to continue to maintain the appearance of legitimacy for a number of years. Indeed, the evidence showed that virtually all of the $3.2 million in fees was reinvested into Consortium's business and expended to maintain the operation.

While we appreciate the court's apparent discomfort with the proportionately larger sentence for money laundering than for the crime of wire fraud, for the purpose of resentencing we caution that the variation represents Congress' intent that money laundering crimes that promote further illegal activity are more dangerous to society and therefore should be punished more severely. We are not, however, foreclosing the possibility that the court may find Ross' case presents additional unique or atypical features that take it outside the money laundering guideline heartland similar to those in United States v. Smith, 186 F.3d 290 (3d Cir. 1999) (Gibson, John R., J.); we merely find that the sentencing transcript does not set forth an adequate basis for such a departure.

Accordingly, we reverse the district court's downward departure on the money laundering sentence and remand for resentencing.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-23-